LEWIS C. TAYLOR, Appellant, *v.* HENRY M. BRADLEY,
Respondent.

In an action for the breach, by the defendant, of an agreement to let a farm
to the plaintiff for three years, each party to furnish part of the stock
seeds, tools, etc., the plaintiff to occupy and work the farm, and have
certain specified supplies for his family, and all proceeds to be divided
equally; the plaintiff is entitled to recover, as damages, the value of his
contract, i. e., what such a privilege of occupying and working the farm,
subject to the conditions of the agreement, and under all the contingen-
cies which are liable to affect the result, is worth.

And such damages may be recovered immediately upon the refusal of the
defendant to perform the agreement.

It seems, that such a letting as the agreement provided for would not,
according to the more recent decisions in this State, create the relation
of landlord and tenant, in which the crops and increase of the farm would
be the *sole property* of the tenant until a division, and the owner's share
would be divided to him as *rent;* but that such a letting gives to each a
joint interest in the crops and increase *ab initio,* and makes them tenants
in common thereof; the relation of the parties being in the nature of
that created by a contract for work and labor, the legal possession of the
farm being in the owner.

*Sed quere,* whether such an arrangement may not be permitted to operate
according to the form and terms employed in the instrument of letting,
i. e., as a lease, technically so called, giving the occupier a term in the
land as tenant, and making the owner's share in the crops *rent,* if that
intention is clearly expressed, or, on the other hand, as an agreement for
work and labor on the farm, the possession of the occupier being the
possession of the owner, and the share of the crops allowed to the occu-
pier being merely compensation for his work and labor, if this intention
of the parties is clear. Per WOODRUFF, J.

APPEAL by the plaintiff from judgment of the Supreme
Court in General Term for the sixth district, affirming
judgment on verdict.

¶ The action is brought for the breach of an agreement
under seal, made, January 20, 1855, by the defendant, to let
to the plaintiff a certain farm, called the Gray farm, in
Guilford, Chenango county, containing 186 acres, for three
years, commencing the 1st of April then next, on the follow-
ing terms: Each party to furnish one-half of all necessary
tools and apparatus for dairying business, one-half all firkins,

salt, seed grain and farming tools for farming, twenty-five cows to be furnished equally. Taylor to furnish team; such team to be kept out of the hay and grain raised; and Taylor to have, for his family, milk, and, from the 1st of April to the 1st of November, butter, out of the undivided stock; after which, all proceeds to be divided between the parties equally, share and share equal, both as to expenses and profits arising from said farm. Each party to pay one-half of all taxes, except extraordinary taxes, which, if any, are to be paid by Bradley, who is also to furnish nails to keep the buildings in repair. Bradley to have the privilege of working and improving said premises during said term, but not in any manner so as to interfere with the privilege of said Taylor in working and occupying the same. * * Taylor to use the wood which is down or decaying, instead of cutting such as is growing, for the use of his family; to draw out all the manure on the land, and manage the farm and premises during the term in a good husband-like manner, and return or leave the same in as good condition as when he takes possession of the same, natural wear and tear excepted.

Before the 1st of April, the defendant, Bradley, who then had a contract for the purchase of the farm and not the legal title, entertained negotiations with one Ingraham, a third party, which resulted in a sale, and by Bradley's procurement the conveyance of the farm was made by the prior owner directly to Ingraham.

Pending the negotiations, the plaintiff became aware that Bradley contemplated selling; he advised Ingraham to go and buy the farm if he wanted it; he told Taylor (the defendant) what he would take to give up his contract; he consented, that the defendant might sell the farm to Ingraham, by "giving him ('me') so much." But the terms upon which he would give up the contract were not agreed to, and no unconditional consent to the sale appeared to have been given by the plaintiff.

The plaintiff, on the 2d day of April, the defendant declining to give an answer, until that day, to his inquiries whether he could have the farm, demanded of the defendant

performance of the agreement, but the sale to Ingraham having been consummated and Ingraham being in possession, performance was refused.

The plaintiff then hired another farm of sixty-seven acres, called the Cornwall farm. His term in the farm on which he had lived until then having expired, he removed his family, his goods, his stock, hay, etc., to the Cornwall farm, which was several miles more remote from his residence than the farm in question; and it was testified, that the Cornwall farm was the only farm he could get. His hiring of the Cornwall farm was for one year, at a rent of $150 for the year, the lessor reserving one-half of the fruit.

Various exceptions were taken, by the defendant on the trial, to the rejection of evidence to prove what he claimed was the value of his contract, the admissibility of which depended upon the rule of damages for the refusal to permit the plaintiff to occupy in accordance with the agreement.

In opposition to the plaintiff's claim to recover for loss of time in preparing to fulfill on his part, and in procuring another farm, and loss on sale of stock purchased, and loss on the sale of hay, which, by reason of not having the Gray farm, he was compelled to sell at a sacrifice, the judge charged the jury, that the plaintiff was only entitled to recover as damages, the difference in the expense of moving from his previous residence to the Cornwall farm, over the expense of moving to the Gray farm.

The plaintiff excepted.

The jury found a verdict for the plaintiff and assessed the damages at $50.

From the judgment the plaintiff appealed.

*Rexford & Kingsley*, for the appellant.

*Henry R. Mygatt*, for the respondent.

WOODRUFF, J. No question appears to have been raised on the trial touching the liability of the defendant. Although it was alleged in the answer that the sale of the farm in question was by the consent of the plaintiff, and such con-

sent is set up as a rescission of the contract declared upon, the proof obviously failed to establish such a rescission, and the case was properly treated as one in which, after the execution of the agreement, the defendant had voluntarily sold the farm and had broken his engagement with the plaintiff and had thereby subjected himself to the payment of whatever damages the defendant had sustained thereby, to be assessed according to such rule as the law prescribes.

Neither the industry of counsel nor my own research has discovered any adjudged case in which the rule of damages for the breach of such an agreement has been declared.

In ascertaining the rule it may be material to determine what is the character of the agreement and what relations would arise between the parties had it been carried out by mutual performance.

The words of the agreement express an undertaking by the defendant " to lease and to farm let " to the plaintiff the farm in question, known as the Gray farm, for the term of three years.

The further provisions show that the farm was to be stocked and furnished mainly by equal contribution of the parties, the plaintiff to wholly furnish some things and to occupy and work the farm; the defendant to wholly supply and pay her other things, and to have the privilege of also working and improving the farm; and all the proceeds of the farm (over and above keeping the stock thereon and the use of certain specified articles in the plaintiff's family) are " to be divided between the respective parties equally, share and share equal, both as to expenses and profits arising from said farm."

If this agreement is to be treated as an agreement for a lease, such as if carried into execution would create the relation of landlord and tenant, then some guide or principle governing the recovery of damages will be found in cases of the breach of agreements to lease.

If it is to be treated as a contract for work and labor, the compensation therefor to be made in the partial support of the family on the farm, and in the final division of the pro-

ceeds of the cultivation, then some analogy will be found in the cases which declare the rule of damages for a breach of contracts to employ for a definite term.

And, if it shall appear to be an agreement of a mixed nature, containing some of the characteristics of both, the rule must be derived from general principles that may be in harmony, if possible, with both, or, at least, conformable to the law of contracts generally.

In *Jackson ex dem. Colden* v. *Brownell* (1 Johns. 267), the permitting of two persons to reside on the farm for one year, cultivate it, and divide the grain with other two, who held under a lease from the lessor of the plaintiff, and also resided thereon, was held a breach of the condition of a lease which forbade more than two families, or tenants, to "reside on, use or occupy any part of the premises." And to the claim that the two persons so cultivating the farm were mere servants, and that their contract was a contract for labor and services, to be paid for out of the crops, LIVINGSTON, J., says: "The only question is, whether they were tenants or barely servants; *each had every character of a tenant and not of a mere laborer for the owner of the soil;* they took under a contract for a year; they occupied the same house; they *had an interest or estate in the land;* they *paid rent in grain;* they might bring their own cattle on and reap what they pleased from it for their exclusive benefit, except grain, which was to be divided.

In *Foote & Litchfield* v. *Colvin et al.* (3 Johns. 215), where one Litchfield sowed fourteen acres of land belonging to the plaintiff Foote with rye, on an agreement that Foote should have one-third of the crop and Litchfield two-thirds, to be divided upon the field, it was held, that the two had a *joint interest in the crop*, and as such could maintain trespass against a wrong-doer who cut and carried it away, and to the argument that Foote's share on the division provided for was to be regarded as rent, and, therefore, as the property of the cropper as *tenant* until gathered and divided, SPENCER, J., holding that the property was joint, says: "this seems best to promote the intentions of landlord and

tenant; if the portion reserved for the *landlord* was to be considered as *rent* and in which he was to have no interest until severance and delivery, it would put it in the power of tenants clandestinely to alienate the produce of the land to the injury of the person who had enabled them to raise the crop."

And, in *Bradish* v. *Schenck* (8 Johns. 151), where Schenck brought an action of trespass *quare clausum fregit* against Bradish, for damage done to a crop, it was proved that one Curtis " took the land of the plaintiff and planted it with corn upon shares.". To the objection that the possession was in Curtis, as tenant, and the property in the crop was in him, it is said *per curiam,* " letting land upon shares for a single crop is *no lease of the land,* and the *owner alone* must bring trespass for *breaking the close.* Schenck and Curtis were tenants in common of the corn," etc.

On the other hand, in *Stewart* v. *Doughty* (9 Johns. 107), where one Van Antwerp let a farm for six years to A. Stewart, the latter stipulating " to render, yield and pay to ` Van Antwerp the one-half of all the wheat, rye, corn and other grain raised on the farm in each year, in the bushel after deducting the seed," with the right reserved to each to terminate the arrangement on giving six months' notice, in an action of trespass by Stuart, junior, claiming under A. Stewart, for breaking, entering and carrying away the crop, against the defendants, who justified as servants of Van Antwerp, who had given the six months' notice, and A. Stewart had removed in compliance therewith, — it was held, KENT, Ch. J., giving the opinion, that the crop belonged to A. Stewart, as emblements, notwithstanding " the lease was determined, since, while the crop was in the ground, it was determined by the lessor." That the sale of the crop while in the ground, before the notice to quit, as the property of A. Stewart, was a valid sale. That the *whole property* in the grain was in the lessee. That, it being a *lease for five years,* by which Van Antwerp " rented and hired and suffered the lessee to possess and enjoy the farm and gave him the quiet and uninterrupted possession," etc.,

*an interest in the soil* passed, and the *lessee* would have been entitled to an action of trespass for any unlawful entry upon it. That the proportion of the productions of the farm which the tenant was yearly to render was a *payment* of *rent in kind;* they were *not tenants in common* in the crops and productions raised; the interest and property in the crops was *exclusively* in the tenant until he had severed and delivered to the lessor his proportion. And, accordingly, the purchaser, having the exclusive interest in the crop, could maintain the action against the lessor for entering, cutting and carrying away.

In *Overseers* v. *Overseers* (14 Johns. 365), where it appeared that one Sweet "lived and worked on a farm in Fort Ann in common with one Hotchkiss for about three years, the farm being worth about $100 a year, and that they held the farm on shares rendering half the produce to Mead, the owner, the court, holding that Sweet thereby gained a settlement in Fort Ann, place the decision on the ground that the transaction was "a *bona fide* renting and occupying as tenant * * for two years and actually paying such rent" within the statute which makes that the test in determining the place of settlement. "Hotchkiss and Sweet had the entire control and ostensible possession of the farm to sow and plant according to their discretion for three years. The one-half of the produce which they had a right to retain is *not* to be regarded as a mere *rule of compensation for their labor;* but the one-half which they were to yield to the proprietor of the land ought to be considered as *rent* for the use of the farm"

Again, in *De Mott & Billson* v. *Hagerman et al.* (8 Cow. 220), where, in an instrument under seal, dated April 1, 1824, "John De Mott agrees to let said Billson work a part of his farm," etc., Billson to work such part as De Mott shall or may direct, to put all grain in, in good order, to find all the seed, and out of the crop to deduct De Mott's one-half, one-half of seed so found; to deliver De Mott at his store one-half of all the produce raised on said farm, etc.; said Billson to go on the farm as soon as convenient

and leave it on the first day of April next." It was held, that "this was a letting of land upon shares; *not a lease;* and, as to the grain raised, the plaintiffs were tenants in common."

If these six cases can be harmonized, it must be on the ground, that three of them *hold,* that such an arrangement as we are considering, when made in reference to a single crop, is not a lease, and the share reserved to the owner is not rent; but the others, that, when the arrangement is for one or more years, the agreement of hiring is a lease, the whole property in the crop is in the cultivator as tenant, it may be sold as his sole property, and the owner of the land acquires no interest therein until it is secured and divided and delivered to him, then he takes it as rent. The use of the terms "let" or "lease," if that could be resorted to, to ascertain when the parties intended to create the relation of landlord and tenant, will not harmonize these cases, because terms were employed in most or all of them, which are apt to create a lease.

If these last named cases were to govern the agreement now before us, we should be able to give it a specific character, and, by referring to the rule of damages for a breach of an agreement to lease, possibly find some guide to the determination of the question raised by this appeal.

But, subsequent cases have not followed those which *held,* that the arrangement has the effect lastly mentioned.

In *Caswell* v. *Districh* (15 Wend. 379), the agreement by the owner was, "to let Districh (the defendant), have his farm *for one year,"* and Districh agreed to sow oats and give the owner one-third in the half-bushel; corn one-third in the basket; wheat one-third in the half-bushel, etc.

And the court say of this, "the agreement was a letting of the premises upon shares, and, technically speaking, it was not a lease," approving *Foot* v. *Colvin; Bradish* v. *Schenck,* and *De Mott* v. *Hagerman,* above referred to; although, here, the agreement was for a fixed term, like *Jackson* v. *Brownell.* Holding, also, that the portion of the crops to be paid to the owner, was not by way of rent, in which the

property would be in the tenant until a division, but secured to the owner a property in the crop *ab initio*, and so made the two parties tenants in common.

The court intimate, that the decision in *Stewart* v. *Doughty*, can be distinguished on the ground, that there the phraseology of the instrument so corresponded with the terms usual in leases, as to indicate that the portion of the crops was intended as payment of *rent in kind*, and hence, the whole interest belonged to the tenant until division.

In *Putnam* v. *Wise* (1 Hill, 234), the relation created by such arrangements is very elaborately discussed. There the instrument was in form substantially like that in *Stewart* v. *Doughty*. It was under seal; the owners "do by these presents lease and to farm let all said land to the parties of the second part, etc.;" then followed particular details, as to the furnishing of seed, etc. ; and the parties of the second part covenanted, "to yield, pay and give to the parties of the first part, one-half of all the grain raised and to be delivered at," etc. ; with details as to the mode of cultivating, etc. ; the feeding of sheep supplied by the parties of the first part; division of the wool; and that the parties of the first part should have the land from 1st April, 1836, to 1st April, 1837, and if they performed the agreement in a manner satisfactory to the owners, they should have it for another year on the same terms.

Mr. Justice COWEN, in giving the opinion of the court, reviews the previous cases, particularly *Stewart* v. *Doughty ;* regards *Caswell* v. *Districh* as in principle overruling it; repudiates any distinction founded on the employment of terms of "letting," "leasing," "rendering," etc., or on the difference between an agreement that is to continue for a single crop and one that is to continue for one or more years ; and *holds*, that the arrangement is, that the occupants or croppers shall come in rather as servants than tenants, taking an interest in the crops and other products as compensation for their labor. The owners are compensated for the use of their land by a share of the crop, and the occupiers are compensated for their labor. That this makes

them tenants in common of the crops and products, unless the terms of the contract (which might be without legal objection,) are such as to secure to one or the other an exclusive interest in some or one of the particular crops or products. If division of products be contemplated, a tenancy in common arises in such as are to be divided. He refers to numerous cases, chiefly from New England, to the effect, that the occupier, being a mere servant, cannot maintain trespass *quare clausum fregit,* but the owner only. That his *possession* is that of the *owner.* That he has no interest in the land that he can assign, and on his death the contract would be at an end.

This case was followed by our present Supreme Court, in *Duechard* v. *Wilson* (15 Barb. 595).

This later view of the subject is in conformity with the cases in Massachusetts, New Hampshire and Maine, *Lewis* v. *Lyman* (22 Pick. 437), and the cases therein referred to being prominent. And a case furnishing a very close analogy is found in Connecticut - *Loomis* v. *Marshall,* 12 Conn. 69. (See *Bennett* v. *Platt,* 9 Pick. 558; *Chandler* v. *Thurston,* 10 Pick. 209; *Beaumont* v. *Crane,* 14 Mass. 400; *Melville* v. *Brown,* 15 id. 82; *Dorkham* v. *Parker,* 9 Greenl. 137; *Kittridge* v. *Woods,* 3 N. Hamp. 503; *Robertson* v. *George,* 7 id. 306; *Bishop* v. *Doty,* 1 Vermt. 37.)

If the question were new, I should say unhesitatingly that each case ought to be chiefly governed by the language employed by the parties to express their intention. Nor do I perceive any legal objection to a stipulation in a lease for the payment of rent in wheat or other product of the land leased. In general, in a lease for years, or a grant in fee, reserving rent, when it is payable in specified articles, as a certain number of bushels of wheat, and so many fowls, etc., it is entirely clear that the parties expect that the payment will be out of the product of the farm. Nor would the reservation be any less *rent,* in my apprehension, if the reservation were in terms " rendering, delivering and paying so many bushels of wheat out of, or parcel of, the wheat raised on the farm."

Parties are certainly at liberty to define and establish their legal relations by the use of terms legally appropriate to the object; and it is not clear to my mind that courts should not give effect thereto, according to their understood legal meaning.

Hence, when A agrees with B that he will employ B, with his team, etc., upon his farm, whether for one year or five, leaving B at liberty to cultivate such fields, and plant such crops as he shall see fit, with just regard to what good husbandry requires, and to pay B, for his work, labor and services, one half of the crops raised, — it is obvious that the parties intend an agreement for work, labor and services, to be paid for by A in a share of the results.

On the other hand, if A should demise, lease and let the farm to B, to have and to hold for the term of one or five years, to be cultivated in a husband-like manner, rendering and paying to A an annual rent for the use of the farm, to wit, one-half of the crops raised, — I perceive no sensible reason why the parties should not be deemed to intend an actual and technical lease, which would entitle the lessee to *possession*, give him a *term* in the land, make his payment *rent* in the technical sense. It may well be inferred from this language, contradistinguished from the other, that here it was intended that the tenant should have exclusive possession and the whole ownership for the term, subject only to his duty to pay the rent as it accrued. While in the other case it would be equally plain that the owner did not intend to divest himself of possession or of title to the crops, but to come under an obligation and duty to compensate for the services by paying therefor out of and according to the quantity of the products. In each case the result at the end of the term, if both performed, would be precisely the same; and yet it may be deemed by parties contemplating such arrangements with an owner of land, very important to their security that they should have all the rights of tenants, and when they obtain an instrument in the form of a lease, in very terms, giving them a term, and reserving rent as such, there would seem to me no legal reason for saying the parties did not

intend just what such terms express. And, therefore, when, upon the instrument itself, the parties have, in legal language, created a term in the land, it should, in accordance with the view expressed by KENT, Ch. J., in *Stewart* v. *Doughty*, be permitted to operate accordingly. But, on the other hand, where the terms employed indicate a hiring of person and team, etc., and an intent that the owner hold the title and possession of the land, and make compensation out of the product, let it operate accordingly.

The mere circumstance that the pecuniary result of complete performance would be identical, is not a conclusive test of the intention of the parties. The intermediate and different incidental legal consequences of the two instruments may have been the great motive to the difference in their form, and presumptively have controlled the parties in their form. And, if a tenant will only commit himself to such an enterprise for a term of years, on condition that he shall have a legal estate in the land, for the term, and that the owner of the fee shall look to the conditions of the lease and his covenants for his compensation for the use of the land as *rent ;* and being of such mind he obtains from the owner an instrument in legal and apt terms to express that result, — why should not the instrument so operate? It is not a sufficient reason for denying such legal effect, that another agreement, which is otherwise expressed, imports an intention to hire and pay for the work and labor.

Notwithstanding these suggestions, the balance of the authorities above cited seems to be, that, notwithstanding the technical terms employed, such an agreement does not amount to a technical lease; that the relation of landlord and tenant is not contemplated, and the portion of the crops reserved to the owner is not *rent*, but compensation for the use of the land, while the other portion is compensation to the occupier, for his work, labor and services, etc.; and that the legal possession of the land is in the owner, and the two are tenants in common of the crop.

If this view be taken of the nature and intent of the agreement before us, what is the rule of damages for its breach?

It is settled that if there be an agreement to employ for a specified term and at a specified compensation, and the employer refuses to perform, he is liable to pay as damages, the stipulated compensation for the full period, provided the proposed employee remains out of employment and in readiness to serve during the whole period. But, although he is *prima facie* entitled to the whole compensation, it is competent for the defendant to reduce the recovery by showing that the plaintiff earned something in other ways during the period; and it is said that such reduction may be insisted upon on proof by the defendant that the plaintiff had the opportunity to accept other employment of the same kind, in the same locality, and refused. (Sedgwick on Damages [2d ed.], 352, ch. 12; *Costigan* v. *The Mohawk and Hudson R. R. Co.*, 2 Denio, 609, and cases cited; *Heim* v. *Wolf*, 1 E. D. Smith, 73.)

But it is quite obvious, that, if such be the rule, the party suing to recover his wages must wait until wages are due before he can recover them, and he can recover no more than have accrued. That is to say, the plaintiff can recover no more nor any faster than he would be entitled to receive if he had been employed. The employer will not be bound to pay the plaintiff for being idle more than he would pay him for rendering the service, and wages will accrue no faster to the plaintiff while idle than while employed, and, therefore, prospective wages cannot be recovered.

Can the rule of damages in such case be varied by declaring, not for wages as such, but for damages for denying to the plaintiff the opportunity to earn the wages? Doubtless the cause of action may be so dealt with, but that will not entitle the plaintiff to the stipulated compensation not yet accrued. *Non constat* whether the plaintiff may not in the future have employment which will be even more remunerative, and the plaintiff, by bringing his action immediately upon the refusal to employ, cannot practically deprive the defendant of the benefit of his reclamation or abatement for earnings which may be subsequently received from other sources. If the action be brought immediately the plaintiff

will, of course, be entitled to nominal damages, and, it may be, under some circumstances, to special damages. But, if he claims as damages the loss of the stipulated wages, he must wait, until, but for the breach, he would have received them.

This is not, however, because he is not entitled to the benefit of his contract, not because the whole value of the contract may not be recovered in a single action and immediately upon the refusal of the defendant to perform, but because the whole wages do not represent the value of the contract, presumptively the services which he does not render and which he can turn to other account are worth as much as the wages, and, therefore, so long as it is uncertain whether he will have other employment, it is impossible to tell what he has lost by the defendant's fault.

Now, if the contract which we have before us was an agreement for a lease, the rule of damages usually applied to such agreements is the difference between the rent the tenant agrees to pay, and the annual value of the term; and special damages may be awarded also for expenses necessarily incurred, which, by reason of the disappointment, are lost. (*Driggs* v. *Doughty*, 17 Wend. 71; *Giles* v. *O'Toole*, 4 Barb. 261; *Lawrence* v. *Wardwell*, 6 id. 424.)

But the conclusion above arrived, it is, that under the authorities, we cannot treat the present contract as an agreement for a lease, properly or technically so called.

And it has been seen that if the agreement be regarded as an agreement for services, the recovery would be the stipulated compensation up to the time of suit brought, subject to the right of the defendant to show earnings, or at least a refusal to earn during the same period, or a portion thereof.

Obviously, if the rule of damages applicable to a mere hiring of services were to be applied to this case, the plaintiff, having brought his action immediately after the breach, could not claim, upon any facts proved, that any thing in the nature of wages or compensation had accrued, or would have then accrued to him had the contract been performed.

Besides, he was not, except in a remote sense, servant. He would have sowed, and planted, and cultivated at his entire discretion, subject only to the rules of good husbandry. He would have supplied a portion of the seed; he would have found food, shelter and maintenance for stock furnished by himself, the growth and produce of which would have been his own; he would have become himself the employer of servants, out of whose labor he had the chance of profit; he would have had a home for his family, and a portion of the supplies for their use; and finally, his settlement would have been in the nature of an accounting and distribution of the stock and profits. This, it is true, did not create a partnership, in the usual sense of that word, and if it did not create the relation of landlord and tenant, it was certainly not a hiring upon wages, the benefit of which could only be derived from performance, or from being out of employment.

In my judgment, we are not driven to the alternative of regarding the present agreement as either the one or the other, but as a special contract, partaking of some of the characteristics of both.

According to the above later cases, it is not a lease, nor an agreement for a lease, and the plaintiff would not have become a tenant, and yet he was not, and would not if he had entered into possession, have become the mere servant of the owner. Indeed, in *Walker* v. *Fitts* (24 Pick. 191), in the Supreme Court of Massachusetts, where it is so uniformly held that the occupier does not own the crops, as tenant, rendering to the owner a portion as·rent, but the two are tenants in common, Justice MORTON says: " The occupier is not a mere servant; it is not a contract of hire in which he receives compensation for services. It is not a mere license to enter and *cultivate,* nor a tenancy at will," — yet he says, " he had a right to occupy and an interest in the land. The owner could not exclude him, nor maintain an action against him for any thing done in pursuance of the agreement."

In view of these observations, and in view also of the

decisions above referred to, the learned justice did very pertinently add, " what the precise nature and character of his interest was, is not so easily determined."

It was, in view of the decisions, a special contract, partaking somewhat of the nature of an adventure, and entitling the party to the chance of profit or benefit derivable therefrom. On an agreement for wages, the court can declare, as matter of law, that if the party serve he is entitled to the stipulated compensation. If the amount be not fixed in the contract, then, what his services are worth — if he finds other employment — they may be allowed in abatement.

Here the court cannot say, that, if the contract had been performed, he would have realized one dollar for his services; *non constat*, that the returns of the cultivation would have equaled his expenditure. It may be presumed that the earth will yield a reward to the husbandman; but, how large? That depends upon details more or less contingent and speculative. And other contracts of the same nature, in the same place, calling for the same expenditure of time, labor, skill, assistance and other details, and upon a farm of the same precise character may safely be said to be impossible.

To my mind the only rule which can be prescribed, and the only rule which will do justice to the parties is, that the plaintiff is entitled to the value of his contract. He was entitled to its performance; it is broken; he is deprived of his adventure; what was this opportunity which the contract had apparently secured to him worth? To reap the benefit of it, he must incur expense, submit to labor, and appropriation of his stock. His damages are what he lost by being deprived of his chance of profit.

How, then, can the value of the contract be proved? If it cannot be proved, then the plaintiff can only recover nominal damages. I think the plaintiff is not without a better rule. The administration of justice frequently proceeds with reasonable certainty of accomplishing what is right, or as nearly right as human efforts may attain, in the face of similar difficulties, and it does so by making the

experience of mankind, or, rather, the judgment which is founded upon such experience, the guide.

Like the question of the market value of goods on a particular day; that becomes a test of damages only, as a means of judging how much one entitled thereto could have realized by a sale, and yet numerous contingencies might have rendered it impossible to sell at that price, and other circumstances might render it grossly improbable that, if he had the goods, he would have sold them at that time.

So, when the damages for not executing a lease of a house are to be ascertained by proving the value of the lease at the rent reserved; and other cases are numerous, in which such value must be ascertained by resort to the judgment of men, whose knowledge of the premises and whose experience in the same or like matters enables them to form a judgment on the subject.

It is quite true, that any opinion so expressed will be open to scrutiny; cross-examination may draw out all the grounds of opinion, and may travel over all the causes of uncertainty and doubt above alluded to, even to the estimate in detail of all the possible results of working the farm, and its expenses and contingencies.

It is also true that any such opinion must be formed in view of all the various uncertainties attending the operation of working the farm, but it is a result based upon years of experience and observation, with knowledge of the farm itself, upon which the plaintiff must rely to prove the value of his contract. How much is such a privilege (whether it be called a lease or right of occupation, or by whatever name) *worth?* Any answer to that question necessarily brings into the mind of any one proposing to buy the privilege, all that it will cost him in time, labor, money or other sacrifice to enter upon performance and perform the contract on his part, and also all the uncertainty as to the result in producing value to him in return. Such privilege may be worth nothing. It may be worth more than the labor and expense attending it. I think it is a proper subject for proof in that form.

According to these views, the question, whether or not the laintiff hired another farm, and what it cost to remove to it, becomes irrelevent.

For these reasons I think the judgment should be reversed and a new trial ordered, costs to abide the event.

Judgment reversed.