Bonnie L. Hargis SMITH, Plaintiff-
Respondent,

v.

Gerald McNEW, Defendant-Appellant.

No. 8247.

Springfield Court of Appeals.
Missouri.

July 30, 1964.

R. A. Esterly, Esterly & Casteel, Carthage, for defendant-appellant.

Vernie Crandall, Frieze & Crandall, Carthage, for plaintiff-respondent.

HOGAN, Judge.

In this case, we are called on to construe an oral agreement to farm on shares made by the plaintiff and defendant. The trial court has permanently enjoined the defendant from entering upon or cultivating certain land which belongs to the plaintiff, and the defendant has appealed. It is the defendant's position that the parties stood in the relation of landlord and tenant and that, since he did not receive a proper notice to quit, he has been wrongfully dispossessed. He further questions the propriety of injunctive relief in the circumstances of the case. The plaintiff, on the other hand, maintains that the agreement in question was only a cropping contract, and therefore the defendant acquired no possessory interest in the land. She also says that injunctive relief was properly granted because of the cultivator's threatened repeated trespass upon her land.

Since the case involves a claim to rights in land, we have inquired into our jurisdiction, which we must initially determine, sua sponte, even though it is not questioned. Taney County v. Addington, Mo. App., 296 S.W.2d 129 [1]. The defendant here claims that the value of the leasehold from which he asserts he was wrongfully excluded is $650.00. This amount is obviously within our jurisdiction. Section 477.-040.[1] What is more, the ownership of the

---

1. All references to statutes and rules are to RSMo (1959), V.A.M.S. and V.A.M.R., except where otherwise specifically noted.

reversion is not questioned, and while estates for years are in one sense interests in land, unless the value of the leasehold is such as to vest the Supreme Court with jurisdiction because of the amount in controversy, an action involving ownership of a leasehold does not involve "title to real estate" in the appellate jurisdictional sense. Thacker v. Flottmann, Mo., 244 S.W.2d 1020, 1023 [8–10]; Blake v. Shower, 356 Mo. 618, 620–621, 202 S.W.2d 895, 896–897 [2, 3]; Bussen v. Del Commune, Mo., 195 S.W.2d 666, 668 [3]. We therefore have. jurisdiction of the case.

Plaintiff was (and is) the owner of a small farm in Jasper County, near Carthage, of which thirteen to fifteen acres were tillable. After the death of her husband in 1957, the land lay idle for a time. In the fall of 1958, desiring to continue the use of her farm, plaintiff, through a mutual acquaintance, contacted the defendant, who owned his own farm and cultivated a number of other tracts (at least four) under arrangements which he described as "leases."

In the "late fall" of 1958, plaintiff and defendant conducted their original negotiations at plaintiff's home. Since the agreement or contract which finally resulted is entirely oral, the parties tracked back and forth, so to speak, a number of times over their conversations, which actually appear to have been quite informal and somewhat indefinite. As the plaintiff recalled the substance of the agreement, it was that "he [defendant] was just to put in the ground anything that he saw fit. I didn't discuss with him what was to be put in, and he was to get two-thirds and I a third, and I paid a third of the combining and a third of the fertilizing." There was no discussion of the length of the term during which defendant was to have the property, nor any determination made that he was to make repairs on the property. No fixed rental was agreed on, nor did the defendant ever pay rent in cash. As the defendant recalled their initial discussion, he had been told by plaintiff that she "wanted someone to rent her ground," and defendant had inspected the premises, advising the plaintiff that he was not interested "in renting it for one crop, or one year," because various improvements needed to be made on the tillable part of the farm; dead trees, brush and some run-down fences needed removing, and there was a ditch which needed to be filled so as to improve the access to the two north fields. The defendant told plaintiff he would "take the ground, if I could have it for two or three years," and told plaintiff she would receive as her rent "one-third of the crop at the mill, less one-third the fertilizer, less one-third the combining." After some consideration, according to the defendant, the plaintiff told him to "just go ahead and farm it like it's yours." The defendant had offered to execute a written lease, but plaintiff declined.

The parties are substantially agreed that the defendant did cultivate the land beginning in "the spring" of 1959, and continued cultivating it until June of 1962. During that time, according to the defendant, he made substantial improvements on the property by removing cross-fences, clearing out fence-rows, and filling in and leveling a ditch between the two north fields. It is unquestioned that the defendant decided what crops to plant and used his own equipment to cultivate the land. On occasion, he obtained assistance from other farmers, sometimes paying them in cash "if I owed them more than I had repaid them in exchange labor," and sometimes defendant "traded labor and helped them." Plaintiff took no part in the cultivation of the land, and defendant furnished his own seed. Mrs. Hargis continued to occupy the dwelling, and it is a fair inference that the parties shared the use of a barn, in which Mrs. Hargis' automobile was kept and in which the defendant's tractor was occasionally stored. When the crop was harvested, the defendant took it to market, and, as plaintiff put it, "[brought] me the third." Except for the year 1962, when the purchaser of the crop made separate checks to the defendant and Mrs. Hargis, Mr. McNew would market the crop, receive the

proceeds, and remit Mrs. Hargis' share to her by check. The expense of the purchase of fertilizer, but apparently none of the other costs of cultivation, was shared, at least during part of the transactions. The records reflect that Mrs. Hargis' net share in the proceeds was $150.00 in 1959, $191.20 in 1960, $178.20 in 1961, and $182.37 in 1962. It is fairly inferable that at the end of each crop year, there was an accounting, of a sort, between the parties; at least the defendant testified that when he "took her [plaintiff] a check," he always "went over the figures with her," "[took] the bills and figure[d] it out," and the parties "settled up."

In February 1962, plaintiff was remarried. In June 1962, after the defendant had harvested the wheat crop, he contacted the plaintiff in order to deliver her share of the proceeds. Defendant was told that plaintiff "had turned the renting of the place over to her husband," and that he, defendant, "might be through." According to the defendant's evidence, he was told to see Mr. Smith, and upon inquiry was told by Mr. Smith that the arrangement or operation would be terminated. Plaintiff's recollection was that she had told the defendant that she and her husband "were going to take care of it ourselves from then on." Plaintiff later consulted an attorney, as did defendant, and on July 3, 1962, plaintiff sent defendant a letter (introduced in evidence) which stated that its purpose was "to notify you that the tenancy on my farm terminate on my farm as of July 3, 1962." Shortly thereafter, defendant, through counsel, notified Mrs. Smith that he regarded the agreement as having created a tenancy from year to year, and

that he expected a sixty-day notice. Acting apparently upon the advice of counsel, the defendant chose to disregard plaintiff's requests to discontinue cultivating the farm, and on July 7, returned to the plaintiff's farm and began plowing, over plaintiff's objection. This action for an injunction followed.

Apparently before this litigation began, the parties sought to characterize their legal relationship rather precisely and fully. The appellant argues here that in order to find the issues presented against him, it was inferentially necessary to reach the conclusion that he was a sharecropper, and argues that such a conclusion was contrary to all the "credible evidence." The appellant argues in his brief that both the term "sharecropper" and the relationship of owner and cropper are subject to sociological opprobrium and cannot be applied to farming practice in Jasper County. Arguing the effect of the evidence at length, and citing the cases of Fisher v. Lape, Mo.App., 176 S.E.2d 871, and Hosli v. Yokel, 58 Mo. App. 169, among others, the appellant contends that he was a tenant from year to year, entitled to sixty days' written notice to quit, as provided in Section 441.050. The respondent, largely upon the basis of a single periodical discussion of the subject,[2] maintains that, in light of the evidence, the defendant must in fact be described as a sharecropper without any possessory interest in the plaintiff's land.

■■■ Contracts to farm on shares are apparently very common,[3] but the proper construction of such contracts, as creating the relationship of landlord and tenant, or other legal status, is the subject of widely divergent views.[4] While our courts have

2. Comment, John C. Crow, Cropper and Tenant Distinguished in Missouri, 24 Mo. L.Rev. 330.

3. See 1 Am.Law of Property, § 3.6, n. 18, p. 190 (1952); in 1959, 16.4% of all farms were operated by croppers, and some 70% of all tenant-operated farm land was operated on shares. II U.S. Census of Agriculture, 1959, pp. 1016–1017. In that year, the Department reported 16,973 farms operated on shares in Missouri. I U.S. Census of Agriculture, 1959, Part 17, State Table No. 20, p. 94.

4. 15 Am.Jur., Crops, § 48, pp. 238–239; 3 Thompson, Real Property, § 1042, p. 142 (Repl. Vol. 1959); 1 Tiffany, Real Property, § 78, p. 114 (3rd ed. 1939); 1 Tiffany, Landlord and Tenant, § 10, pp. 38–39 (1912).

consistently held that an oral lease of agricultural land for more than one year creates a tenancy from year to year which can be terminated by the landlord only by giving written notice to quit at least sixty days before the end of the term, unless the date for determination has been fixed by the contract, or notice is dispensed with by agreement,[5] most authorities, including our own cases, agree that a contract to farm on shares does not necessarily create a tenancy.[6] Ordinarily, the principal distinction drawn between a "tenant" and a "cropper" is that the tenant has a possessory interest in the land, whereas the cultivator has only an incorporeal interest which may be merely a license, or may be a limited and qualified interest in the land, depending on the terms of the contract.[7] In any event, the interest of the cultivator determines after the crop is gathered and divided,[8] and the cultivator or cropper is not a tenant entitled to the statutory notice to quit required by Section 441.050. Brunner v. Gorley, Mo.App., 227 S.W.2d 81, 85 [1, 2].

■■ Since the rights of the parties between themselves depend upon the individual contract, possibly the most precise

and illuminating statement that can be made about the construction of agreements to farm on shares is that the mutual rights and liabilities of the parties "depend upon the intention of the parties as gathered from the attendant circumstances."[9] By no means all contracts or agreements for the occupation of farming lands are construed as creating the relationship of owner and sharecropper, even though they are not held to be leases; there is respectable authority, dating from an early day, that such contracts may create a species of joint adventure,[10] while on the other hand, an examination of the evidence as a whole may show that the cropper is only an employee, even though the parties have referred to themselves as "owner" and "tenant." Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 495–496 [1–4] [5, 6]. Where an agreement or contract to farm on shares is oral and informal, as in the case here, and the evidence is conflicting, the question whether a tenancy, or some other legal relation, was created is essentially a question of fact.[11]

■ We have no doubt that in this case the primary question of fact to be resolved by the trial court was whether it

5. Vanderhoff v. Lawrence, Mo.App., 201 S.W.2d 509, 512–514, aff'd., Mo., 206 S.W.2d 569, 570 [2]; Note, 13 Mo.L. Rev. 324.

6. Johnson v. Hoffman, 53 Mo. 504, 507; Jackson v. Knippel, Mo.App., 246 S.W. 1007, 1008–1009 [1]; Moser v. Lower, 48 Mo.App. 85, 89–90; 1 Am.Law of Property, § 3.6, p. 189 (1952).

7. Davies v. Baldwin, 66 Mo.App. 577, 580; Moser v. Lower, supra, 48 Mo.App. at 90; Delaney v. Root, 99 Mass. 546, 548–549; Taylor v. Bradley, 39 N.Y. 129, 143; 1 Am.Law of Property, § 3.6, p. 189 (1952); 1 Tiffany, Real Property, §§ 78 and 79, pp. 114–118 (1939).

8. Moser v. Lower, supra, 48 Mo.App. at 90; Kamerick v. Castleman, 23 Mo.App. 481, 491–494; Delaney v. Root, supra, 99 Mass. at 548–549.

9. Johnson v. Hoffman, supra, 53 Mo. at 507 ("* * * no definite rule can be laid down on this subject. Each case

must be determined by the words of the written agreement between the parties.") Moser v. Lower, supra, 48 Mo.App. at 89, ("There can be no precise rule for the interpretation or construction of contracts of this nature, and each case must be considered and governed by its own circumstances.") See 15 Am.Jur., Crops, § 48, pp. 238–239; Thompson, op. cit., § 1042 at 145; 30 Am.Jur., Joint Adventures, § 17, p. 951; 52 C.J.S. Landlord and Tenant § 797 a., pp. 719–720.

10. Taylor v. Bradley, supra, 39 N.Y. at 143–144; Bowers v. Graves & Vinton Co., 8 S.Dak. 385, 66 N.W. 931, 932; Annos., 48 A.L.R. 1055, 1068; 83 A.L.R. 909, 917; 2 Tiffany, Landlord & Tenant, § 253, pp. 1648–1649 (1912).

11. Williams v. Cleaver, 4 Houst. (Del.) 453, 459; Fisher v. Nicola, 214 Iowa 801, 241 N.W. 478, 479; Hampton v. Struve, 160 Neb. 305, 70 N.W.2d 74, 79 [14, 15]; Davies v. Baldwin, supra, 66 Mo.App. at 580; Moser v. Lower, supra, 48 Mo.App. at 89.

was the parties' intention for the defendant to have possession of the premises, as against the plaintiff, for it is the existence of a possessory estate which distinguishes a tenant's interest from that of a cropper or cultivator, whether the cultivator be called a co-adventurer or employee, and whether his interest be defined as a license or qualified easement.[12] We do not understand the appellant to contend that he was excluded from the premises while a crop was yet unharvested nor to say that some balance is owing from past operations. If such were the case, other considerations might be involved. But the sense of appellant's position is that the agreement between Mrs. Smith and Mr. McNew must be construed as an oral lease, and that Mr. McNew was entitled to sixty days' written notice prior to the end of the term of his lease, though appellant does not, we must say, specify the date to which he claims his term ran. In our view, the only question necessarily decided by the trial court is whether the parties' contract was in fact an oral lease, and we reject out of hand the notion advanced here by both parties that the trial court's issuance of an injunction necessarily determined that the defendant was a mere servant or employee of the plaintiff. Nor, for that matter, is it determinative on this appeal what reasons the trial court may have had in mind when he issued the injunction, if the judgment is correct on any theory. City of St. Louis v. Evans, Mo., 337 S.W.2d 948, 954 [2]; Brown v. Montgomery, 354 Mo. 1041, 1050–1051, 193 S.W.2d 23, 27 [3]. The question decided below was one of fact, and giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, we must affirm the judgment unless it is "clearly erroneous." Rule 73.01(d).

The contract here was oral, and was quite informal and indefinite. We do not deprecate the arrangement for that reason,

but in candor we must say that much of the evidence about the parties' rather formal written communications after they had consulted counsel, and much of their testimony concerning their use of the words "lease" or "demise" in their conversations, when they both denied knowing the difference between a farm tenant and a cropper, is of little value in assessing their original intention. As we view the evidence, it could very reasonably be found that the defendant's sole purpose in going on the land was to plant, cultivate and harvest one crop a year. Both parties very forthrightly stated on several occasions during the trial that they did not discuss or consider their agreement in terms of possession, and the defendant stated that plaintiff could have "come on" the property "if she wanted to." The defendant does not contend that he occupied the farm as a dwelling place; the plaintiff continued to reside on the farm during the term of the agreement, and the defendant used only a part of the whole acreage. The sole building involved, it appears, was a barn which the plaintiff and defendant shared; the defendant stored a part of his equipment in the barn a part of the time, and "it was understood that she [plaintiff] had the use of the barn for her car on one side." We consider it to be of some significance that neither party sought to have the other execute a written lease, although the execution of such a lease was discussed, and defendant "knew that a written lease is a lot better than an oral lease."

There is no evidence that the parties limited their agreement to any definite, specific term. The defendant emphasized during the trial that he had insisted on having the use of the land "for two or three years," but the time when he actually entered on the land was very indefinitely stated; the agreement was executed, according to the defendant, "in the late fall

12. Hogue v. Wurdack, supra, 298 S.W.2d at 496; Jackson v. Knippel, supra, 246 S.W. at 1008–1009 [1]; Pearson v. Lafferty, 197 Mo.App. 123, 128, 193 S.W. 40, 41–42 [1]; Comment, supra, 24 Mo. L.Rev. at 330–331; 1 Am.Law of Property, § 3.3, p. 180; id., § 3.6, p. 189 (1952).

of '58, as near as I can remember," and defendant apparently entered or started cultivating the land "in the spring of '59." The evidence is susceptible to the construction that each year's undertaking was considered to be a separate transaction; however, the intervals at which the agreement was renewed for an additional year seem to have been very irregular.

■ The defendant produced several witnesses to establish the custom and usage of the community, and he argues here that by custom and usage the defendant was a tenant, or lessee, and not a cropper or cultivator. We are not persuaded that the testimony of these witnesses actually established a custom or practice in Jasper County. Though one witness testified that "if there is such a thing as a specialist in the county * * * I'd be about as close as you'd get," the testimony of this witness and the others testifying to the existence of a custom or practice consisted largely of their opinion as to what constituted a landlord-tenant or owner-cultivator relation. The evidence offered did not, in our view, actually establish a uniform custom or practice for the county, and is not persuasive in establishing what the parties' rights were. Southwestern Freight and Cotton Press Co. v. Stanard, 44 Mo. 71, 82. See Davis v. Gatewood, Mo., 299 S.W.2d 504, 509 [3, 4].

■ Much of the law dealing with the rights of the parties to a contract to farm on shares is very nebulous, both as to the nature of the cultivator's interest in the land, if any, and as to the nature of the legal relation between the owner and cultivator. It could be convincingly argued, we think, that the plaintiff and defendant were engaged in a species of joint adventure, which had been tacitly renewed from year to year; it might also be argued that their agreement was only a contract for personal services. But however that may be, we consider that it might reasonably be found that the parties did not intend to create a tenancy from year to year, or that the de-

fendant had any possessory estate in the land, and therefore we conclude that the judgment is not "clearly erroneous" insofar as it determines that the defendant was not entitled to sixty days' written notice to quit.

■ The appellant further contends that the issuance of an injunction in this case was improper, as the respondent had an adequate remedy at law. He points to the fact that the plaintiff had several legal remedies available and argues that since the plaintiff had an adequate remedy at law, the jurisdiction of equity could not be invoked.

This contention must be examined against the factual background of the case. The defendant testified, and the court could have found, that after the 1962 wheat harvest, apparently in June of 1962, the plaintiff told defendant that she had "turned the renting of the place over to her husband," and indicated she no longer wanted to continue the arrangement with the defendant. The defendant "wanted to be agreeable," so he went to see Mr. Smith. The record indicates that Mr. Smith, on two subsequent occasions, advised defendant that Mrs. Smith would no longer continue the present arrangement. Mrs. Smith also consulted counsel and gave notice to Mr. McNew to quit the premises. The defendant, by counsel, then advised Mrs. Smith that he did not consider he had received a proper notice and would continue to farm the land, and thereupon he returned to the plaintiff's farm and, over her protest, began plowing. Shortly thereafter, the plaintiff sued out an injunction.

We cannot agree that the plaintiff was not entitled to injunctive relief. There appear to be adequate grounds for believing that defendant intended to continue cultivation of the plaintiff's land, though he no longer had any right of occupancy, and had he continued, and had a crop been sown, then controversy would have arisen over title to the crop, and the plaintiff would have been denied the use of her land as

well. We think it could be fairly said that an injunction would be justified to prevent a frequent repetition of the trespass, as well as to avoid multiplicity of litigation. We believe the authorities sustain the proposition that a cropper or cultivator who remains in possession of land to which he no longer has a right of occupancy may be restrained by injunction. Tharp v. Sieverling, 128 Kan. 235, 276 P. 821, 822; Colliton v. Oxborough, 86 Minn. 361, 90 N.W. 793, 794; Union Central Life Ins. Co. v. Audet, 94 Mont. 79, 21 P.2d 53, 56 [5], 92 A.L.R. 571, Anno., 92 A.L.R. 578, 586, VI (h).

For the reasons indicated, the judgment is affirmed.

RUARK, P. J., and STONE, J., concur.