Ronald **HOFFMAN** and Randy **Hoffman, Respondents,**

v.

The **ESTATE OF** Jack **SILER, Crystal Jones, Personal Representative and Crystal Jones, Appellant.**

**No. WD 70247.**

Missouri Court of Appeals, Western District.

Jan. 19, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 2010.

Application for Transfer Denied April 20, 2010.

---

John B. Neher, Lexington, MO, for appellant.

Robert H. Schnieders, Oak Grove, MO, for respondent.

Before ALOK AHUJA, P.J., JAMES M. SMART, JR., and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

Crystal Jones, as personal representative of the Estate of Jack Siler, appeals the trial court's judgment in favor of Ronald and Randy Hoffman on their wrongful eviction claim. Jones says the court erred in finding that the Hoffmans were year-to-year tenants and, thus, entitled to sixty

days' notice under section 441.050 [1] before termination of their tenancy. The judgment is affirmed.

## Background

Norman Smoots and Jack Siler had an agreement concerning the farming of a portion of Mr. Siler's land in Lafayette County. The agreement was not in writing and commenced before 1995. Beginning in 1995, Ronald and Randy Hoffman (father and son) joined Norman Smoots (at Mr. Smoots's request) in farming Siler's farm ground of approximately 350 acres. Siler shared the expenses and received part of the profit from the crops harvested. Smoots shared his portion of the proceeds with the Hoffmans. The Hoffmans shared in the tilling, planting, and hauling jobs, while Smoots did most of the combining. That arrangement continued for nine years through the crop season of 2004.

Jack Siler, the owner of the farm, died in December 2004. Crystal Jones was appointed the personal representative pursuant to Siler's last will. In early 2005, a few months after Siler's death, Ms. Jones informed Mr. Smoots that she did not intend to continue a farming arrangement with Smoots. Ms. Jones then asked the Hoffmans to agree to farm the property without Smoots. The Hoffmans agreed, with an understanding that they would split the expenses and profits with the estate fifty/fifty.

In spring 2005, Ms. Jones asked Ronald Hoffman to purchase all of the seed for the 2006 planting season because Hoffman could obtain the seed for a discounted price. That fall, the Hoffmans purchased the seed and did the necessary terrace and ditch work on the property in preparation for the 2006 planting season. Ms. Jones reimbursed Hoffman for half the price of the seed. That fall, the Hoffmans planted twenty acres of wheat after being told by a conservation agent that they must do so in order to keep the farm in compliance with the government crop subsidy program.

In the fall of 2005, a will contest was filed, challenging Siler's will that specified Ms. Jones as the sole beneficiary and personal representative. Due to the will contest, Ms. Jones was temporarily replaced as personal representative by the public administrator, Martha Pollard. Ms. Pollard and the Hoffmans discussed the possibility of changing the farming arrangement for the upcoming 2006 crop year. Ms. Pollard eventually decided against it, informing the Hoffmans that she did not intend to make any changes to the fifty/fifty split of expenses and profits for the 2006 crop year.

The will contest subsequently was resolved in favor of Ms. Jones.

Ms. Jones sought reappointment as personal representative in early April. On February 23, 2006, five days before the "agricultural year" commenced,[2] the attorney for Crystal Jones, anticipating her reappointment as personal representative, sent a letter purporting to terminate "any and all farm lease or sharecropping agreements or interest you may have, or have had," in the crop land. The letter asserted that the Hoffmans were "sharecroppers"

---

1. All statutory references are to the Revised Statutes of Missouri (RSMo) 2000, unless otherwise noted.

2. "Agricultural years customarily begin on March 1. Therefore, written notice must be given by December 30 of the preceding year for year-to-year leases measured by the customary agricultural year." *Mo. Farm Law* Section 4.72 (Mo. Bar 3rd ed.2006). Although the statute uses the phrase "end of the year," without the use of the adjective "agricultural," the parties here agree that the statute is to be construed as meaning "agricultural year."

as opposed to "tenants" and notified them that they would not be planting any further crops on the land. The letter also informed the Hoffmans that Ms. Jones did not intend to enter into an agreement with them to farm the property for the 2006 crop year. On March 6, 2006, Ms. Jones's attorney sent a second notice to Mr. Hoffman reiterating that she would soon be re-appointed and that in anticipation of that event she was terminating the farming relationship.

The Hoffmans filed a petition against the estate alleging unlawful eviction. The Hoffmans alleged that they were year-to-year tenants and, pursuant to section 441.050 RSMo, entitled to sixty days' notice before termination of their tenancy. The Hoffmans sought damages for their lost profits for the 2006 crop year and for their litigation costs.

At the bench trial, the Hoffmans presented evidence designed to show that the arrangement from 1995 through 2004, and with the estate in 2005, was a year-to-year tenancy. Ms. Jones sought to show that the arrangement was that of a sharecropper, for which no notice to terminate is required.

The Hoffmans (and Mr. Smoots until 2005) supplied their own equipment to farm the property, paid for half the seed and fertilizer, and received half the profits. The fifty/fifty profit arrangement included proceeds from government subsidies for set-aside or non-tilled acreage. The parties agreed at trial that the Hoffmans made all the decisions with regard to the farming operation, i.e., what to plant, where and when to plant, the chemicals to use and when to use them, when to till, when to fertilize, when to harvest. They also performed all the maintenance, (terracing, ditch work, fence repair, brush clearing). They did not charge separately for maintenance of the property and were not separately paid for it.

Ronald Hoffman testified that he dealt with the government agencies for the farm subsidy programs. He said the subsidy programs included land that was not being cultivated. The Hoffmans said that they were the only persons farming the property. Nevertheless, they said, they (and Smoots before them) had always allowed various others, including Mr. Siler, Ms. Jones, and others to come on the property to hunt. They said that allowing the hunting on the property was something that went back many years to the agreement between Siler and Smoots, both of whom liked to hunt and to allow others to hunt the property.

Ronald Hoffman said that until receiving Ms. Jones's letter in early March, he understood that he and his son would be farming the property in 2006. Ms. Jones's testified that she and Ronald Hoffman had a conversation sometime before September 2005 in which he specifically asked for a written lease. She said she declined because the estate was unsettled and she was unsure what their future arrangements would be. In early 2006, she said, she decided to let someone else farm the property.

The court found in favor of the Hoffmans, awarding them $25,468 in damages. The court found that the Hoffmans "were wrongfully evicted from the property without the proper [sixty days'] notice as provided in Section 441.050." The court further found that the evidence showed that they "were year to year tenant farmers rather than simply sharecroppers as argued by Defendants." The court explained that the Hoffmans

> made all crop decisions, including what to plant, when to plant, and all farming practices. [The Hoffmans] provided all maintenance to the property, including

maintenance on areas that were not farmed as well as those that were farmed, staked out terraces and ditches throughout the property, shared in government payments, including those for non-cultivated ground. When the government had a problem with the land being in compliance, they contact[ed] Plaintiff Hoffmans for corrections to the property to bring it within government compliance.

Ms. Jones appeals.

## Standard of Review

As in any court-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ We apply the basic facts of this case (which are essentially undisputed, though the reasonable inferences therefrom may be disputed) to the law to determine whether the facts can be interpreted as describing a tenancy relationship as opposed to a sharecropper relationship. Whether a farm cultivator is a tenant or a sharecropper depends on the facts of the relationship agreed to by the parties. The issue of tenant or sharecropper is often largely a question of fact, and a sometimes difficult one at that. *See, e.g., Smith v. McNew*, 381 S.W.2d 369, 373–74 (Mo.App. 1964).

## Discussion

Ms. Jones says the court erred in entering judgment in favor of the Hoffmans on their wrongful eviction claim, because the facts show that they were sharecroppers, as opposed to tenants, and, thus, not entitled to the sixty days' notice required by section 441.050.

■ Oral agreements to farm on shares are both lawful and common. *See Smith v. McNew*, 381 S.W.2d at 372 n. 3. Such leases are construed to be year-to-year leases, and not month-to-month. Often, the "rent" to be paid under such a lease is a portion of the proceeds of the crops. The tenant keeps track of the expenses, cultivates the crops, harvests and sells the crops, and pays the owner an agreed portion of the net proceeds. Often there is a duty to maintain and repair the tillable property in question. The tenant is understood to have a possessory interest in the land being farmed. *Id.* at 373.

■ A sharecropping arrangement is similar to a tenancy in that it also involves a division of the crop produced or the proceeds of the crop produced. The parties often share in the cost of production and the division of the crop. In a sharecropping relationship, there is generally no obligation to maintain and repair the property. Sometimes the sharecropper will harvest only his designated portion of the crop, leaving the owner's portion of the crop in the field for the owner to harvest. A sharecropper's right to cultivate the land and produce a crop is perhaps more likely limited to a portion of the tillable land, with the owner tilling the balance of the land or sharing it with another sharecropper. *See, e.g., id.* at 373–74. While a tenant has a possessory interest in the land, the sharecropper has only an incorporeal interest such as a license to farm the land. *Id.* at 373. Typically, when faced with the issue of whether a tenancy in the land was created, the courts look to the question of whether the purported tenant had the right to the possession and control of the tillable land in question. *See Jackson v. Knippel*, 246 S.W. 1007 (Mo. App.1923). While the legal concept of possession is a matter of *law*, the issue of the *parties' understanding* of their respective

rights, is necessarily a matter of *facti.* *See* *McNew,* 381 S.W.2d at 375.

■ Although a sharecropper has certain rights, a sharecropper has no entitlement to the statutory notice under section 441.050 RSMo. *McNew,* 381 S.W.2d at 373; *Davidson v. Frakes,* 639 S.W.2d 164, 165 (Mo.App.1982); *Brunner v. Gorley,* 227 S.W.2d 81, 85 (Mo.App.1950). Section 441.050 provides a measure of protection for tenants, requiring that if the tenancy is to be terminated for the forthcoming crop year, the tenant must be provided sixty days' notice before the end of the year.

In *McNew,* plaintiff landowner and defendant cultivator had an oral agreement for the cultivation of the plaintiff's land. 381 S.W.2d at 374. The defendant cultivator decided what crops to plant, furnished his own seed, and used his own equipment. *Id.* The plaintiff owner continued to reside on the farm. The defendant cultivated only a part of the whole acreage, and used only a part of plaintiff's barn. *Id.* The trial court had ruled in favor of the plaintiff owner's contention that the defendant was a "cropper" and not a tenant. *Id.* The court realized that *the facts* could be viewed in more than one manner. *Id.* at 375. The court said, using the pre-*Murphy* standard of review, that "the trial court determination was not 'clearly erroneous' " because "it might reasonably be found that the parties did not intend to create a tenancy from year-to-year," and that the defendant did not have "any possessory estate" in the land. *Id.* The court, therefore, affirmed the judgment that the defendant was not entitled to sixty days' written notice to quit. *Id.* The court grounded its conclusion on the legal concept of possession but deferred to the trial court's factual interpretation of the parties' understanding and intent. *Id.* Although the "clearly erroneous" standard applied in *McNew* was made inapplicable in *Murphy,*

536 S.W.2d at 32, we find *McNew* instructive in its analysis of the issue of possession of the land in that case.

Here, counsel for Ms. Jones relies heavily on the decision in *Davidson v. Frakes,* 639 S.W.2d 164 (Mo.App.1982). In *Davidson,* the farmland had been owned by Mr. and Mrs. Mallory. *Id.* at 165. Frakes's father had an arrangement with Mallory to farm corn, beans, tobacco, and wheat. Later, some hay land (that formerly had been farmed by someone else) was added. The record does not specify who made the decision about what crops to plant on the property. After Mallory's death, the same farming relationship continued under authority of the executors. *Id.* at 166. The executors, and then the new purchasers, the Davidsons, furnished half of the expenses. As for the tobacco, Frakes furnished all the fertilizer and labor and "materials for the beds" and he received "two-thirds." Frakes said that the owner "furnished the sticks and the stripping room" and the electricity, and "got a third." *Id.*

The court noted that Frakes's actions were inconsistent with any possessory interest in the land, and that the only right that Frakes claimed was the right to plant, cultivate, and harvest the crops. *Id.* When Frakes purchased from the Mallory estate the mobile home that had been formerly occupied by the Mallorys, he *asked permission* to "live there," (*i.e.,* keep the mobile home on the farm premises he was then farming). *Id.* This request for permission tended to show, the court reasoned, that he did not regard himself as actually possessing the property. *Id.* Also, Frakes stated that the "stripping room" for tobacco was furnished by the owner, indicating that Frakes understood that the *owner* possessed the land used for stripping rather than that land being part of a leasehold. *Id.* The facts also showed that Frakes had no obligation to repair or

maintain the property. *Id.* Mallory made repairs during his lifetime, and the subsequent owners (the Davidsons) made repairs thereafter. *Id.* The court regarded the repair responsibility as indicating that the owners viewed themselves as possessing the land. *Id.* This court in *Davidson* regarded the evidence as clearly showing a sharecropping relationship, finding "no evidence" that Frakes was a tenant. *Id.* at 167.

Ms. Jones asserts that this case is directly on point with the *Davidson* case. Her counsel candidly acknowledges that he reviewed *Davidson* before advising his client and suggesting that the arrangement in question here was a sharecropping arrangement. In fact, Ms. Jones's counsel asserts that this case is an even stronger case for finding a sharecropping arrangement than was *Davidson* because in *Davidson* the alleged tenant also lived on the property, and yet the court *still* found it was a sharecropping arrangement. We disagree.

■ We believe that Ms. Jones and her counsel misinterpret *Davidson* and overlook some of the marked differences with the *Davidson* case. Here, the Hoffmans effectively possessed and controlled the tillable land (as shown by, *inter alia,* their maintenance of the property and their dealings with the government). The fact that the Hoffmans allowed people on the land for hunting does not show that they did not have the legal right to exclude people. Hunting on the 350 acres of land was a tradition carried forward from Siler and Smoots, both of whom liked to hunt and invited friends to hunt. The fact that the Hoffmans carried it forward does not inform us as to whether the Hoffmans understood they had the power, if they wished to exercise it, to exclude hunters, or whether they simply accepted the tradition rather than disappoint Smoots and others. There was no evidence of any kind that any hunting activities had ever interfered with the Hoffmans' planting, cultivating, and harvesting activities on the tillable land, or with their maintenance of the entire property, or that the Hoffmans had ever been concerned about the possibility. Had there been evidence that the Hoffmans had asked Smoot, Jones and the others *not to hunt* on the land, and had their request been either denied or granted, such would have been some evidence that the Hoffmans did not regard themselves as in possession and control of the land. That is not the case here.

The Hoffmans maintained the land and carried out repairs to the property. They made the crop decisions. The U.S. Department of Agriculture worked exclusively with the Hoffmans, both as to the cultivated land and as to the land withheld from cultivation. The fact that, in *Davidson,* Mr. Frakes occupied a mobile home on the property did not assist Frakes's argument in *Davidson,* and actually undermined Frakes's argument, because Frakes's explicit request to keep his new mobile home on the property (since he was farming it) showed that he understood he *had to ask permission* to do so, which is an act inconsistent with his possession of the property. *Id.* at 166. We cannot agree with the appellant that the *Davidson* case dictates a reversal in this instance.[3]

The mere fact that the parties share expenses and crop proceeds does not dictate a conclusion one way or another. There is much more to be examined in determining the nature of the relationship. Here, many of the basic facts are essen-

---

**3.** This court in *Davidson* focused on the aspects of the evidence revealing that *Frakes never claimed or understood* that he had a tenancy in the land. That is why, we believe, that the court was explicit in holding that there was "no evidence" that Frakes was a tenant. 639 S.W.2d at 167.

tially undisputed, but there are inferences that may reasonably be drawn from the facts in light of the totality of the circumstances. The factual interpretation of the factual premises and the reasonable inferences therefrom are appropriately left for the trial court as a fact finder. It is only those facts which inescapably suggest what the farmer and the landowner understood as to legal *possession and control* of the property that will be invoked as having specific legal significance by the reviewing court. *See id.* at 166; *McNew,* 381 S.W.2d at 375.

What the record shows here is that the Hoffmans supplied their own equipment; made all the decisions with regard to the farming operations; performed unpaid maintenance not related to farming and on both tilled and untilled land (including maintenance of fences on both tilled and untilled land); made application for government programs and dealt directly with conservation agents (for example, in the fall of 2005, a conservation agent told Mr. Hoffman to plant twenty acres of wheat to remain in compliance with the subsidy program, which Mr. Hoffman did without consulting the land owner); and received profits from non-tilled land, especially land in the government crop subsidy program.

There were no facts indicating that the Hoffmans had a "restricted sphere of activity" on the land or lacked access to the entire property. *See* John Charles Crow, Comment, *Cropper and Tenant Distinguished in Missouri,* 24 Mo.L.REV. 330, 334 (1959). The record showed that the Hoffmans did everything, including maintaining the property and harvesting the crops and delivering them for payment. The landowner did not cultivate or harvest any crops on the land.

The fact that the Hoffmans asked for a written lease from Ms. Jones can be interpreted either (as Ms. Jones would) as an attempt to *change the relationship* from sharecropping to tenancy or, simply, as a desire to put *in writing the existing relationship.* A need for clarification might have been foreseen (wisely) by the Hoffmans in view of the fact that Mr. Siler had passed away, increasing the likelihood of confusion. The trial court obviously inferred that it was the desire to avoid confusion—and not a desire to change the relationship—which caused Hoffman to ask for a *written* lease. Such an inference by the trial court is entirely reasonable.

The trial court judgment was supported by substantial evidence and was not against the weight of the evidence. The trial court did not misinterpret or misapply the law. Our ruling in this case makes it unnecessary for us to address the respondents' alternate theories of recovery (seeking the same relief) asserted in the trial court.

### Conclusion

The judgment is affirmed.

All concur.