T.C. Memo. 1998-249

UNITED STATES TAX COURT

EARL M. HASBROUCK AND DONNA M. HASBROUCK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10964-96.                          Filed July 7, 1998.

Earl M. Hasbrouck and Donna M. Hasbrouck, pro sese.

<u>Joan S. Dennett</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CARLUZZO, <u>Special Trial Judge</u>:  This case was assigned
pursuant to section 7443A(b)(3) of the Internal Revenue Code, as
amended and in effect when the petition was filed, and Rules 180,
181, and 182.  Unless otherwise indicated, section references are
to the Internal Revenue Code, as amended and in effect for the

relevant period.  Rule references are to the Tax Court Rules of Practice and Procedure.

This case is before the Court on petitioners' motion for litigation and administrative costs pursuant to section 7430[1] and Rule 231.

In a notice of deficiency issued on February 29, 1996, respondent determined deficiencies in petitioners' 1990, 1992, and 1994 Federal income taxes in the amounts of $307, $818, and $1,215, respectively.

The petition was filed on May 31, 1996, and on July 26, 1996, respondent's answer was filed.  On November 27, 1996, a stipulated decision was entered in which the parties agreed there were no deficiencies in Federal income taxes for any of the years in issue.  Petitioners thereafter filed the motion here under consideration seeking an award of litigation and administrative costs in the amount of $7,775.81 (of which $4,006.39 is attributable to their own time).  The stipulated decision was vacated and filed as a Stipulation of Settled Issues on December 16, 1996.  Respondent's response to the motion was

---

[1] References to sec. 7430 are to that section as amended by sec. 1551 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2752 (effective for proceedings commenced after Dec. 31, 1985) and by sec. 6239(a) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3743 (effective with respect to proceedings commenced after Nov. 10, 1988).

filed on February 18, 1997. A hearing on petitioners' motion was conducted on May 27, 1997, in Helena, Montana.

The issue for decision is whether petitioners are prevailing parties within the meaning of section 7430(c)(4).

FINDINGS OF FACT

Petitioners are husband and wife. They filed timely joint Federal income tax returns for the years in issue. At the time the petition was filed, they resided in Ulm, Montana. References to petitioner are to Earl M. Hasbrouck.

Petitioner has been employed as an independent contractor in the construction industry since 1961. Donna M. Hasbrouck is, and was during the relevant periods, a professional bookkeeper. On their 1990 and 1992 Federal income tax returns, petitioner listed his occupation as self-employed, and Donna M. Hasbrouck listed her occupation as bookkeeper. Sometime in 1993, petitioner injured his back. On their 1994 Federal income tax return, petitioner listed his occupation as disabled, and Donna M. Hasbrouck again listed her occupation as bookkeeper.

In October 1987, petitioners purchased an 80-acre tract of land located in Ulm, Montana (the property). Before purchasing the property petitioners had never been engaged in the trade or business of farming. Petitioners purchased the property with the intention eventually to raise livestock.

At the time they purchased the property, petitioners lived approximately 11 miles away in Great Falls, Montana. A few sheds were on the property at the time of its purchase.

Approximately 62 acres of the property had been placed in the Conservation Reserve Program (CRP) by the previous owner. The CRP is a program implemented by the Agricultural Stabilization and Conservation Service (ASCS) and the Commodity Credit Corporation (CCC) on behalf of the U.S. Department of Agriculture (USDA). The purpose of the CRP is to preserve and improve the soil and water resources of erodible cropland. Under the CRP, the USDA enters into a long-term contract with the owner or operator of highly erodible cropland to convert the cropland, which is normally devoted to the production of an agricultural commodity, to a less intensive use. The less intensive use is outlined in a conservation plan developed by the Soil Conservation Service and the local ASCS and typically requires the owner or operator to establish a permanent vegetative cover on the land, as well as to control noxious weeds on the CRP acreage.

In exchange for the owner's implementation of the conservation plan, the CCC agrees to: (1) Pay the owner or operator an annual rental payment for the period of years specified in the contract; (2) share with the owner or operator the cost of establishing the conservation practices specified in

the conservation plan; and (3) provide technical assistance to assist the owner or operator in carrying out the contract.

On December 31, 1987, petitioners signed a Form CRP-1, Conservation Reserve Program Contract (the contract) to continue the enrollment of the 62 acres[2] in the CRP. The contract provided for an annual rental rate of $43 per acre and was to be effective until 1996. A representative of the CCC signed the contract on February 3, 1988.

An appendix to the contract lists the eligibility requirements for participation in the CRP. In pertinent part, the appendix provides:

> 2    ELIGIBILITY REQUIREMENTS
>
>> A    In order for any person to be
>>      eligible for payments under this
>>      contract, such person must be an
>>      owner or operator of eligible
>>      cropland and --
>>
>>        *    *    *    *    *    *    *
>>
>>      (2)  if an owner of eligible
>>           cropland, must have owned such
>>           cropland for not less than 3
>>           years prior to the close of
>>           the applicable period for
>>           entering in Contracts with
>>           CCC, unless:
>>
>>             *    *    *    *    *    *    *
>>
>>           (c)  it is determined that the
>>                new owner of such

---

[2] There is evidence in the record that at some later time, 65.1 acres, rather than 62 acres, were placed in the CRP.

cropland did not acquire
such cropland for the
purpose of placing it in
the CRP.

In order for a producer[3] to qualify for payments under the CRP, an annual determination is made by the local ASCS regarding whether the producer is actively engaged in farming.  For this purpose, petitioners submitted, on an annual basis, a Form CCC-502A, Farm Operating Plan For Payment Eligibility Review For An Individual (Farm Operating Plan form or form), to the Cascade County ASCS Office[4] outlining their implementation of the conservation plan.  The Farm Operating Plan form provides that the information collected will be "used in applying statutory payment eligibility and limitation provisions."  The form defines "Active Personal Labor" as follows:

1.     ACTIVE PERSONAL LABOR - is personally providing physical activities necessary in a farming operation, including activities involved in land preparation, planting, cultivating, harvesting, and marketing of agricultural commodities in the farming operation.  Other physical activities include those physical activities required to establish and maintain conserving cover crops or conserving use acreages and those physical activities necessary in livestock operations.

---

[3] A producer is defined as a person who as owner, landlord, tenant, or sharecropper would have shared in the risk of producing the crop on the land to be placed in the CRP (or shares in the proceeds therefrom).

[4] At some point in the 1990's, the Cascade County Agricultural Stabilization and Conservation Service became known as the Cascade County Farm Service Agency.

Petitioners submitted a completed Farm Operating Plan form each year of the CRP contract to the Cascade County ASCS.  As a representative example, petitioners submitted to the Court their completed Farm Operating Plan form for the year 1996.  In response to question 13.A. on the form, "What estimated percent or hours of active personal management do you provide?", petitioners indicated "100%".  Petitioners also indicated that they owned 100 percent of the equipment used in the farming operation.

The Cascade County ASCS made an annual review of the information provided by petitioners in their Farm Operating Plan forms and issued what petitioners termed a "farm status determination" each year.  As a representative example, petitioners submitted to the Court the farm status determination they received from the Cascade County ASCS on May 6, 1992, which states:

> The Cascade County ASC Committee has completed its review of your farm operating plan for 1992.
>
> Based on the information submitted, the committee determined that you are actively engaged in a farming operation as an individual, separate and apart from any other individual or entity.  It also understands that you are separately responsible for your interest in the operation.
>
> Based on these findings, the Committee has determined that you are one "person" for payment limitation purposes, separate and distinct from any other individual or entity.

This determination is based on the facts as submitted. Any unrevealed circumstances could require the application of a more restrictive rule.

In fulfilling the terms of the CRP contract, petitioners, among other things, planted approximately 2,750 trees, prepared the land and planted the grasses specified by the Soil Conservation Service, built fences, purchased seeders, tractors, and water tanks, and kept several goats to prevent the spread of noxious weeds.

On their Federal income tax returns, petitioners reported "Wages, salaries, tips, etc." of $38,840, $30,254, and $23,374 for taxable years 1990, 1992, and 1994, respectively. Petitioners also reported gross receipts from petitioner's Schedule C construction business in the amounts of $10,758 for 1990 and $15,337 for 1992. Consistent with petitioner's disabled status, petitioners did not attach a Schedule C for his construction business to their 1994 Federal income tax return.

On Schedules F attached to their Federal income tax returns for the years in issue, petitioners reported as income the $2,580 received pursuant to the CRP contract, as well as cooperative distributions.[5] Petitioners deducted the following Schedule F expenses:

---

[5] Petitioners reported cooperative distributions of $118 and $77 for taxable years 1992 and 1994, respectively.

|                        | 1990     | 1992     | 1994     |
|------------------------|----------|----------|----------|
| Depreciation           | $4,421   | $2,627   | $1,523   |
| Feed purchased         | 254      |          |          |
| Gasoline, fuel, and oil| 350      | 947      | 1,330    |
| Insurance              | 464      | 468      | 689      |
| Mortgage interest      | 3,929    | 3,689    | 2,260    |
| Other interest         | 1,135    | 575      |          |
| Labor hired            | 149      |          |          |
| Repairs and maintenance| 1,040    | 1,833    | 3,221    |
| Seeds and plants purchased | 254  | 832      | 188      |
| Supplies purchased     | 2,171    | 457      | 762      |
| Taxes                  | 355      | 250      | 648      |
| Utilities              | 1,327    |          | 640      |
| Veterinary fees and medicine | 253|          |          |
| Other expenses:        |          |          |          |
|   Legal & acct. | 222   |          |          |
|   Miscellaneous | 30    | 37       | 120      |
|   Advertisement |       | 10       |          |
|   Office supplies |     | 40       | 152      |
|   Road expenses |       |          | 1,071    |
|   Windbreak exp. |      |          | 77       |
|   Total expenses | 16,354 | 11,765 | 12,681   |

Petitioners' Schedules F reflected net losses of $13,774, $9,067, and $10,024 for 1990, 1992, and 1994, respectively.

In April 1995, petitioners received notification from respondent that their 1992, 1993, and 1994 taxable years were to be examined.  In May 1995, Donna M. Hasbrouck, accompanied by Brian Bras, an accountant with the firm that prepared petitioners' tax returns, traveled to respondent's offices in Great Falls, Montana, and met with Sue E. McConaughy (Ms. McConaughy), the tax auditor responsible for the examination. Ms. McConaughy had previously requested information from petitioners regarding the deductions and losses reflected on the Schedules F.

Although certain books and records relating to the property were provided to Ms. McConaughy, it is unclear from the record whether the farm status determination letters from Cascade County ASCS had been provided to her at the initial meeting.

Ms. McConaughy issued her examination report by letter dated June 9, 1995 (the 30-day letter).  Insofar as relevant for our purposes, the 30-day letter proposed to disallow the losses claimed on Schedules F of petitioners' 1992, 1993, and 1994 Federal income tax returns.  The following explanation for the proposed disallowance was provided:

> Because the amount of income you receive each year is fixed by the federal government, no amount of effort or management skill on your part can increase it. Therefore, it has been determined that, at this point in your operation, you are not yet in business.
>
> In order to report income and expenses on Schedule F, you must be in the business of farming.  Because you are not, the use of Schedule F is not appropriate.

The examination report reclassified the CRP income and expenses as rental income.  The report explained the adjustments as follows:

> Previous court rulings have determined that, when CRP income is not farm income, it is reported as rental income.  Your CRP income for the three years shown has been reclassified as rental income and the allocable expenses reclassified as rental expenses.
>
> The expenses allocated to the rental income are only the ones that are directly connected with the maintenance of the real estate.

In a six-page letter dated June 22, 1995 (the protest letter), Mr. Bras disputed Ms. McConaughy's findings. The protest letter covered in detail petitioners' acquisition of the property in October 1987 and their subsequent use of the land under the CRP contract. The "Statement of Facts" portion of the protest letter states:

> Pursuant to the CRP contract, as signed by taxpayers on 2/3/88, taxpayers must meet strict conditions in order to initially qualify and continue to qualify under the CRP. Among those conditions are the following:
>
>      *   *   *   *   *   *   *
>
> 3.   Based upon their obligation under the CRP contract, taxpayers have actively maintained their property using conservation practices and other farm management techniques. As stated above, taxpayers' farming activities are subject to an annual review by the local ASCS office.
>
>     Taxpayers have purchased seeders, tractors, water tanks, and built fences to prevent adjoining farmers' cattle from grazing upon their land. Seeding the land with grass seed and building shelter belts is required by the CRP contract. Taxpayers also have purchased water tanks and haul water since they do not have water available on a yearlong basis. They have also purchased a few goats to prevent the spread of noxious weeds such as leafy spurge and knapweed. The State of Montana currently is attempting to eradicate the spread of these and other noxious weeds. Again, these expenditures are dictated by the terms of the CRP contract.
>
>     In the initial years of operation, taxpayers paid wages to employees for the building of the fence and other farm related work. Taxpayers filed the appropriate payroll reports with both state and federal authorities on the employees' wages.

No expenses have been incurred since the purchase of the land which do not specifically relate to the use of the property as prescribed by the CRP contract. Taxpayers have not incurred costs of a nature which are only for the future use of their farm after they are no longer being paid by the CRP.

In the protest letter petitioners requested that the matter be transferred to the appropriate Appeals officer if the Examination Division did not agree with petitioners' position. In addition to a Form 2848, Power of Attorney and Declaration of Representative, and the examination report, the protest letter listed as enclosures the following:

CRP Contract
Letter from ASCS Office dated 3/16/87
Letter from ASCS Office dated 8/8/90
Letter from ASCS Office dated 9/7/90
Letter from ASCS Office dated 7/20/93
Discussion of CRP payments from the "1992 Farm Income
     Tax Workbook"
Page 17 of IRS Publication 225

The letters from the ASCS Office listed above refer to the farm status determination letters petitioners received annually from the Cascade County ASCS.

Sometime in September 1995, respondent requested that petitioners sign a waiver of the limitations period. In a letter dated October 2, 1995, to Mark Murray, Operations Manager at respondent's Great Falls office, petitioners declined to sign the waiver, stating:

there is no need for an extension of time. This matter was appealed to higher authority three months ago. It should not even be in your office. It especially

should not be on the desk of Sue McConaughy. I feel there is ample time remaining (until April 15, 1996) in which to get the matter before an appeals officer before any statute of limitations expires.

To that end, this is a demand that you forward the Hasbrouck appeal to the next level. Your excuse: "...we need the original documents with which to send the matter to appeal" is, in my opinion, self-serving nonsense. Your tax examiner made a determination and issued subsequent "findings" based on what is available, there is no logical reason an appeal cannot be accomplished using the same documents.

Request for any extension of time is denied. The 1992, 93 and '94 Federal Income Tax returns of HASBROUCK stand as submitted. We have a right to an appeal. We demand that right and we demand it be accomplished before an 90 day letter is issued.

In a letter dated October 26, 1995, petitioners requested the "previous court rulings". Mark Murray responded to this letter, in a letter dated October 30, 1995, which states in relevant part:

I am responding to your letter dated October 26, 1995 in which you requested "...all pertinent data, citations of law and/or authority, and detailed referenced support data..." regarding the examination of your 1992, 1993, and 1994 federal income tax returns.

I am unable to comply with your request at this time because, at your request, the case files and their contents have been forwarded to the Appeals Division in Denver and now fall within that office's jurisdiction. I will, however, forward your request so that appropriate reference information from the file can be sent to you.

Petitioners' case was assigned to Anita Teichrow, an Appeals officer in the Helena Appeals Office. In a letter dated November 30, 1995, Ms. Teichrow again requested that petitioners sign a consent to waive the limitations period. Ms. Teichrow's

November 30, 1995, letter referenced the following taxable

periods: 12/31/90, 12/31/92, 12/31/93, and 12/31/94.

In response to Ms. Teichrow's November 30, 1995, letter,

petitioners stated in a December 11, 1995, letter:

> Ms. Teichrow, this writer has no sympathy for the
> IRS' position you assert in your letter(s).  Given the
> fact that the IRS has, via it's own internal action,
> deliberately intentionally delayed adjudication of the
> Hasbrouck appeal, your excuses are understandable - but
> they are still merely "excuses."  We believe you are
> attempting to justify five months of IRS delays by
> imposing unreasonable time constraints on the taxpayer.
> We are also without sympathy to the IRS' position
> because, in your letter, you threaten, "...I cannot
> proceed with consideration of your case unless I
> receive [the extension forms] within ten days from the
> date of this [November 30] letter..."  That caveat
> pretty much ends our relationship.  No matter how you
> sugar-coat your comments, we believe they can be
> interpreted no other way than to be a blatant attempt
> at intimidation.  Simply stated, we will not be
> intimidated by threats - or any other form of
> unprofessional conduct.

> *       *       *       *       *       *       *

> No unjustified extension of time will be
> forthcoming.  The 1992 tax deadline is still five
> months away.  We suspect a reasonable appeals officer
> will be able to see the whimsical nature of the tax
> examiner's so-called "decisions" within fifteen minutes
> of responsible review.  By any mathematical standard,
> that still leaves five months time in which to dispose
> of the appeal.

Also on December 11, 1995, petitioners wrote to Paul Thornton in

Helena, Montana, whom they identify as respondent's "Regional

Director of Appeals".  In that letter, petitioners stated:

> Inasmuch as Teichrow did voluntarily remove herself
> from the Hasbrouck tax matter after December 10th, this
> correspondence is intended to request that you

personally intervene and take the appropriate administrative action to ensure that the Hasbrouck appeal is placed into the hands of another IRS officer who will have the time for a responsible review.

Sometime in early December, petitioners spoke with Greg Loendorf, Ms. Teichrow's supervisor. On the basis of this conversation, petitioners wrote a letter dated December 14, 1995, to Ms. Teichrow, and stated:

> To begin with, I acknowledge that your supervisor wants you to remain on the Hasbrouck tax matter as the appeals officer. I have no objections.
> Your supervisor stated that you would be able to schedule an appeals conference sometime during early January. You may schedule it at your convenience. Just give us sufficient warning so that we may include Brian Bras.
> It is my understanding that the conference is to be held prior to the time any ninety day letter is issued. It is also my understanding that, prior to the time the conference is held, some responsible individual is going to see to it that Brian Bras and I finally have the opportunity to review the citations of law and/or authority we requested long, long ago in support of the tax examiner's so-called "findings." It is of extreme urgency we have the opportunity to review this data prior to the time of any conference because not one person involved in this dispute really understands that basis for McConaughy's allegations.

> * * * * * * *

> Please see to it we receive the IRS support data.

In a letter dated December 19, 1995, Ms. Teichrow responded to petitioners' December 14, 1995, letter, as follows:

> I spoke with my supervisor, Greg Loendorf, yesterday, since my understanding of your conversation with him was not the same as recited in your letter dated December 14, 1995.

He advised me that if you do not sign a consent, the 90-day letter will be issued. The letter will not be issued until the first part of January because of the processing time necessary for us to do so. However, Mr. Loendorf told me he agreed I would hold a conference during the 90-day period in an attempt to resolve the case.

I have not had the opportunity to review your case in depth. However, it appears you received copies of the examiner's workpapers along with her audit report. Therefore, at this time, you will not receive anything further from me regarding "citations of law and/or authority."

I reserved a room in the Great Falls IRS office for Thursday, January 18, 1996 in order to hold the conference. * * *

By letter dated December 20, 1995, petitioners responded as follows to Ms. Teichrow's letter of the previous day:

The tenor of your remarks indicates you intend no co-operation. What is the point of scheduling a meeting if the IRS intends to withhold the evidence necessary to resolve the dispute?

* * * * * * *

We did receive copies "of the examiner's workpapers and her ... report," as you suggest. * * * The IRS has already been notified that none of us who has reviewed the examiner's work papers and report even remotely understands what basis McConaughy could possibly have used to make the determinations she did. It is our right to know and understand that basis before any meeting is scheduled. Because it is our right to know and understand that basis - and also because none of us can draft an intelligent reply to the examiner's allegations in our own defense because we do not know and understand that basis - this paragraph constitutes Notice to the IRS that until such time as the support data we have repeatedly requested are furnished, there will be no meeting. There is nothing to meet about.

* * * * * * *

* * * I feel it will be fair to stipulate that before consideration be given to future meetings, the IRS will be required to have the citations of law and/or authority and support data we requested delivered into our hands <u>at</u> <u>least</u> two weeks prior to the time any meeting is scheduled. * * *

21 days will be considered a reasonable time in which to furnish the citations of law and/or authority and support data. * * *

On January 2, 1996, petitioners requested from Ms. Teichrow a complete copy of respondent's administrative file. Ms. Teichrow responded by letter dated January 2, 1996, as follows:

In response to Mr. Hasbrouck's request for a copy of the entire file, I am enclosing a complete copy of the examiner's report including workpapers showing the adjustments made for 1990, 1992, 1993 and 1994. I have not copied the entire file as much of the remainder is correspondence.

I acknowledge receipt of your letter dated December 20, 1995. It is my understanding from this communication that you have declined to meet with me on January 18, 1996.

I will not be responding to your request for "citations of law and/or authority and support data" within 21 days. As previously advised, my work is managed on a first-in, first-out basis. As such, I have not had an opportunity to make an in-depth review of your case.

In a letter to Ms. Teichrow dated January 3, 1996, petitioners acknowledged receipt of the copy of the examiner's report and stated:

The IRS steadfastly <u>refuses</u> to furnish <u>any</u> proof that the deficiency it claims is based on law or fact, in spite of telling us: "Previous court ruling[s] have determined ..."  "What" previous court rulings?  Court rulings have designations so we can look them up. "What" are those designations?
I do decline to meet with you until such time as you comply with the request made by this taxpayer on

October 26, 1995 to furnish data in support of IRS argument(s) * * *.

In a letter dated January 8, 1996, petitioners again wrote to Ms. Teichrow's supervisor, Greg Loendorf.  In this letter, petitioners requested that Mr. Loendorf "see to it that some responsible individual within your department furnishes us with a list of personnel as it pertains to the Appeals Division 'chain of command,' beginning with the name of the assigned appeals officer all the way to the top."  Petitioners also claimed that Ms. Teichrow "refused to provide the citations of law and/or authority and support data" that petitioners had previously requested.

As indicated, on February 29, 1996, respondent issued a notice of deficiency to petitioners in which deficiencies in their 1990, 1992, and 1994 Federal income taxes were determined. Relevant for our purposes, the adjustments that gave rise to the deficiencies were explained as follows:

> (a)  The $9,067.00 and the $10,024 shown on the 1992 and 1994 returns, respectively, as Schedule F farm losses are not allowed because it has not been established that any amount of loss was sustained in a trade or business.  However, certain of these deductions are allowable as rental expenses, below. Therefore, taxable income is increased $9,067.00 for 1992 and $10,024.00 for 1994.
>
> (b)  Of the losses addressed above, $3,622.00 for 1992 and $1,941.00 for 1994 were expended for the production, maintenance or conservation of income.  The remainder of the losses are not allowable since they were not sustained in a trade or business and were not expended for the production, conservation or

maintenance of income.  Therefore, taxable income is decreased $3,622.00 for 1992 and $1,941.00 for 1994.

(c)  Due to an increase in the amount of adjusted gross income for 1993, as computed at Exhibit A, no amount of net operating loss deduction is available to be carried from 1993 to 1990.  Consequently, the tentative allowance for 1990 is recaptured in full.

In a letter dated March 18, 1996, petitioners wrote respondent and again demanded "copies of all evidence and support data previously requested".  Petitioners noted that their previous requests for the "court rulings" referenced in Ms. McConaughy's report have been "ignored and denied by IRS action", and that the "previously requested data supporting the IRS position" was required for the "effective presentation" of petitioners' case.

In a letter dated March 29, 1996, to John Rigler, Problem Resolution Officer with respondent's Helena office, petitioners again requested information regarding the "chain of command" for respondent's Appeals Office.  Petitioners stated that this information was "necessary for the preparation of our defense in seeking adjudication."

Petitioners wrote another letter on April 23, 1996, to John Rigler, again outlining their position for the "complaint before the ombudsman" regarding the "professional protocol of the appeals section actions."  Petitioners also requested the "appeals division technical operations manual outlining one-by-one the procedural steps required of IRS personnel in appeals

resolution."  In another letter to John Rigler, dated April 24, 1996, petitioners further requested that they be given more information from respondent's "technical manual" regarding "the administration of the IRS operations department for case preparation".

On May 3, 1996, petitioners retained Thomas E. Towe to represent them in this case.[6]

In a letter dated May 22, 1996, John Rigler responded to petitioners' April 12, April 13, and April 24 letters.  Mr. Rigler stated:

> You clearly have been frustrated in your efforts to find out what "court rulings" were referred to in the examination report proposing an adjustment to rental income and expenses on your 1990 income tax return.  To rectify this problem, an IRS attorney researched this matter and provided me with the following information to give you:

>> Under the Conservation Reserve Program (CRP), the farmer receives a yearly rental payment from the government in return for implementing a ten year conservation program.  The farmer is barred from harvesting any crops from the land or utilizing it for grazing purposes.  Other than planting cover and eradicating noxious weeds, the land must be left alone.  See In re Matter of Lundell Farms, 86 B.R. 582, 584 (Bankr.W.D.Wis. 1988); 7 C.F.R. section 704.1 et seq.

>> In In re Way, 120 B.R. 81, 82 (Bankr.S.D.Tex. 1990), the Court explained CRP as follows: "Under farm programs like the [CRP], owners and operators

---

[6] On Mar. 6, 1997, Mr. Towe filed a motion to withdraw as counsel of record for petitioners.  Mr. Towe's motion was granted on Mar. 20, 1997.

of highly erodible cropland may enter into a long-term contract with the Secretary of Agriculture providing for conversion to a less intensive use of that cropland.  By contracting with the U.S. Department of Agriculture, Agriculture Stabilization Conservation Service ("ASCS") not to place farm land into production, the farmer foregoes the possibility of generating farm income by growing crop and selling.  In re Welch, 74 B.R. 401, 403 (Bankr.S.D.Ohio 1987); In re Shepard, 75 B.R. 501, 504 (Bankr.N.D.Ohio 1987)."

Title 16 of the U.S. Code specifically designates these payments as rental payments.  Once the CRP Contract is in place, the regulations require that if the property is sold or transferred, the new owner of the property has the right to terminate the CRP Contract.  See 7 C.F.R. section 704.21; In re Waters, 90 B.R. 946 (Bankr.N.D.Iowa 1988).

The next question, however is whether an individual is in a trade or business.  In a similar situation, an individual owned 160 acres of farm land of which approximately 120 acres was tillable.  The farmer then placed 116.9 acres in the CRP Program.  In this case, the Service determined that the individual had retired from farming.  Private Letter Ruling 8822064.  Thus, absent any other facts, should an individual purchase farm land already in the CRP Program and owns no other operating farm land, the Service will more than likely determine that the individual is not in the trade or business of farming since there is not material participation occurring with respect to such commodity.

*   *   *   *   *   *   *

There is nothing further I can do for you.  As I explained in my April 5, 1996, letter to you, the IRS problem resolution program cannot take the place of normal appeals channels.  Since you chose not to resolve this matter with IRS Appeals Officer Anita Teichrow, you must decide if you wish to petition the U.S. Tax Court.  You must do so within the 90-day statutory period.  If you petition the U.S. Tax Court, IRS District Counsel will again attempt to resolve this

disputed tax deficiency with you short of going to court. * * *

The petition in this case was filed on May 31, 1996. In their petition, petitioners allege that they were actively engaged in the trade or business of farming because they:

> have a contract with the Cascade County ASCS Committee representing the United States Department of Agriculture for the CRP program which requires that they actively participate in the farming operation. They have, in fact, fulfilled the terms of their agreement and have, pursuant to that end, done considerable farming activity each year in order to fulfill their obligations under the CRP contract. In addition, they have actively managed the balance of the 80-acre tract, i.e., they have taken care of the animals which the agricultural land sustains.

In his answer, filed on July 26, 1996, respondent denies petitioners' allegation that they were actively engaged in the trade or business of farming during the years in issue.

On June 14 and July 23, 1996, Mr. Towe made written requests for a conference with Helena District Counsel for the purpose of settling petitioners' case.

In a letter dated October 16, 1996, to Mr. Towe, respondent conceded the deficiencies against petitioners. Respondent explained the concession as follows:

> On September 25, 1996, the Tax Court decided the case of <u>Ray v. Commissioner</u>, [T.C. Memo. 1996-436] * * * which dealt with CRP payments and whether they are received in the taxpayer's trade or business. The facts are very similar to your clients' case. The only difference, however, is that in <u>Ray</u>, the taxpayer was a farmer at the time he acquired the land. In * * * [your] case, your clients were not farmers when the CRP land was purchased. Prior to the determination of the

Ray case, our research failed to locate any other cases directly dealing with the issue currently in dispute. In light of the Court's recent decision in Ray, we have reconsidered our position and we are conceding the case in full.

OPINION

A taxpayer who is a prevailing party in an administrative or court proceeding is entitled to an award of reasonable litigation and administrative costs incurred in such proceedings. Sec. 7430(a). To be a "prevailing party", a taxpayer must establish that: (1) The position of the United States in the proceeding was not substantially justified; (2) the taxpayer substantially prevailed with respect to either the amount in controversy or the most significant issue or set of issues presented; and (3) the taxpayer met the net worth requirements of 28 U.S.C. sec. 2412(d)(2)(B) (1994) on the date the petition was filed. Sec. 7430(c)(4)(A). Additionally, the taxpayer must also establish that all available administrative remedies have been exhausted insofar as litigation costs are concerned, sec. 7430(b)(1); that the taxpayer has not unreasonably protracted the administrative or judicial proceedings, sec. 7430(b)(4); and that the costs claimed are reasonable in amount, sec. 7430(c)(1) and (2). All of the foregoing requirements must be satisfied. Minahan v. Commissioner, 88 T.C. 492, 497 (1987).

In response to petitioners' motion, respondent argues: (1) That petitioners are not prevailing parties because the position

of the United States was substantially justified; (2) that petitioners have failed to exhaust their administrative remedies; and (3) that the costs claimed are not reasonable. Respondent concedes that petitioners have satisfied the other requirements of section 7430.

We first consider whether respondent's position was substantially justified. For the following reasons, we find that it was.

A position is substantially justified if it is justified to a degree that could satisfy a reasonable person and has a reasonable basis in both fact and law. Pierce v. Underwood, 487 U.S. 552, 565 (1988) (interpreting similar language in the Equal Access to Justice Act, 28 U.S.C. sec. 2412 (1988)); Nalle v. Commissioner, 55 F.3d 189, 191 (5th Cir. 1995), affg. T.C. Memo. 1994-182; Swanson v. Commissioner, 106 T.C. 76, 86 (1996). The determination of reasonableness is based on all of the facts and circumstances surrounding the proceedings. Nalle v. Commissioner, supra at 191. A position has a reasonable basis in fact if there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pierce v. Underwood, supra at 564-565. A position is not substantially justified in law if legal precedent does not provide substantial support for the Commissioner's position given the facts available

to the Commissioner.  Coastal Petroleum Refiners, Inc. v.
Commissioner, 94 T.C. 685, 694-695 (1990).

Respondent has taken the position that petitioners have
failed to establish that they were actively engaged in the trade
or business of farming during the years in issue.  Respondent
took this position in the administrative proceeding when the
statutory notice of deficiency was issued to petitioners on
February 29, 1996, sec. 7430(c)(7)(B), and in the court
proceeding when the answer to the petition was filed on July 26,
1996.  We may consider the reasonableness of respondent's
position in the administrative proceeding separately from
respondent's position in the judicial proceeding.  Huffman v.
Commissioner, 978 F.2d 1139, 1144-1147 (9th Cir. 1992), affg. in
part, revg. in part and remanding on another issue T.C. Memo.
1991-144.  In this case, however, because the positions are the
same, we consider them in a single analysis.

Petitioners argue that respondent's position was not
substantially justified either in fact or in law.  In
petitioners' view, the fact that the property was subject to the
CRP contract conclusively establishes that they were actively
engaged in the trade or business of farming for purposes of
section 162(a) during the years in issue.  They point out that
the USDA and the Internal Revenue Service (IRS) are both agencies
of the United States and suggest that because the former agency

determined that they were "actively engaged in farming", respondent's position that they were not actively engaged in the trade or business of farming cannot be considered substantially justified. In addition they argue that respondent's concession of the underlying deficiencies is in effect tantamount to a concession that his position was not substantially justified.

We disagree with petitioners on both points. As pointed out by respondent, the "determination" made by the USDA through the Cascade County ASCS that petitioners were "actively engaged in farming" is not a determination for Federal income tax purposes that petitioners were actively engaged in a trade or business for purposes of section 162(a). It is clear to us that different criteria are taken into account in making such determinations. For example, a profit motive is necessary to support a deduction claimed under section 162. Nothing in the record suggests that a profit motive is necessary to qualify for CRP payments. Furthermore, the fact that the Commissioner ultimately concedes all or part of a case is not sufficient to establish that the Commissioner's position was unreasonable, Sokol v. Commissioner, 92 T.C. 760, 765-767 (1989); Sher v. Commissioner, 89 T.C. 79, 87 (1987), affd. 861 F.2d 131 (5th Cir. 1988), but is merely a factor to be considered, Estate of Perry v. Commissioner, 931 F.2d 1044, 1046 (5th Cir. 1991).

Deductions, such as those claimed by petitioners on their Schedules F, are a matter of legislative grace. A taxpayer claiming such deductions must prove entitlement to them. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). In particular, for a taxpayer to claim a deduction on a Schedule F, the taxpayer must establish that the farming activity constitutes a trade or business. The Supreme Court has stated that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity * * * does not qualify." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). The question of whether a taxpayer is engaged in a trade or business requires an examination of all the relevant facts. Id. at 35. In applying the facts and circumstances test, courts have focused on three factors indicative of whether a trade or business exists.

First, the taxpayer must undertake the activity intending to make a profit. Drobny v. Commissioner, 86 T.C. 1326, 1340 (1986), affd. 113 F.3d 670 (7th Cir. 1997); Green v. Commissioner, 83 T.C. 667, 687 (1984). Second, the taxpayer must be regularly and actively involved in the activity. Snyder v. United States, 674 F.2d 1359, 1364 (10th Cir. 1982). Third, the taxpayer's business operations must have actually commenced.

Goodwin v. Commissioner, 75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982).

Respondent developed his position in this case on the basis of his examination and investigation of petitioners' returns. Cf. Powers v. Commissioner, 100 T.C. 457, 473 (1993), affd. in part, revd. in part and remanded 43 F.3d 172 (5th Cir. 1995). Other than the information relevant to the qualification of the property for the CRP contract, petitioners failed or refused to provide complete information to respondent regarding whether they were actively engaged in the trade or business of farming during the years in issue. Some of the factors respondent took into account in determining that petitioners were not engaged in the trade or business of farming include: (1) Petitioners had not engaged in the business of farming prior to their purchase of the property in 1987; (2) petitioners' only activities with respect to the property during the years in issue were those undertaken pursuant to the CRP contract; (3) petitioners planned to start a cattle operation on the land after the expiration of the CRP contract; (4) petitioners resided approximately 11 miles from the property during the years in question; (5) petitioner was employed in the construction industry and Donna M. Hasbrouck was employed as a bookkeeper during the years in issue; (6) petitioner sustained a back injury in 1993 which resulted in his listing his occupation as "disabled" on petitioners' 1994 tax

return; (7) petitioners earned substantial amounts of income from sources other than their farming activity for the years in issue; and (8) petitioners incurred significant losses from their farming activity during the years in issue which they used to offset their other income.

From the foregoing facts, we do not consider it unreasonable for respondent to have concluded that petitioners' activities in connection with the property did not constitute a trade or business during the years in issue. Accordingly, we find that respondent's position had a reasonable basis in fact.

Petitioners also contend that respondent's position was not substantially justified in law because it is inconsistent with positions taken by the Commissioner in two private letter rulings and Ray v. Commissioner, T.C. Memo. 1996-436.

The rulings consider whether CRP payments were includable in the taxpayers' net earnings from self-employment and therefore subject to the self-employment tax imposed by section 1401. The Commissioner's conclusions regarding the nature of the CRP payments, as articulated in the rulings, were dependent upon factual determinations focusing on whether the taxpayers materially participated in the trade or business of farming during the relevant years. The private letter rulings do not stand for the proposition that a taxpayer is actively engaged in the trade or business of farming merely because the taxpayer is

eligible to receive CRP payments with respect to certain property.[7]

Nor do we agree, as petitioners suggest, that Ray v. Commissioner, supra, supports a finding that respondent's position was not substantially justified in law.  As in the private letter rulings, the issue in Ray was whether CRP payments were includible in the taxpayer's net earnings from self-employment and therefore subject to the self-employment tax imposed by section 1401.  To be income subject to the self-employment tax, we stated that "the income in question must derive from a trade or business carried on by an individual, and that there must be a nexus between such trade or business and the income that the individual has received."  In Ray, however, the parties stipulated that the taxpayer was "engaged in the active trade or business of farming and/or cattle grazing".  Thus, the

---

[7]In Rev. Rul. 60-32, 1960-1 C.B. 23, respondent took the position that payments attributable to the acreage reserve program described in the Soil Bank Act, title I of the Agricultural Act of 1956, ch. 327, 70 Stat. 188 (formerly 7 U.S.C. 1801), constitute net earnings from self-employment to the recipient unless the recipient does not operate, or materially participate in the operation of, a farm.  But see Wuebker v. Commissioner, 110 T.C. ___ (1998)(rejecting the reasoning of the revenue ruling and holding that CRP payments, as rental payments, are not subject to the self-employment tax imposed by sec. 1401).  Neither party made reference to this revenue ruling in connection with the motion here under consideration.  Because the revenue ruling contemplates an examination of facts and circumstances, we do not consider respondent's position in this proceeding to be contrary to the position stated in the revenue ruling.

inquiry in that case was not whether the taxpayer had entered in the trade or business of farming, but whether the CRP payments had a direct nexus to the taxpayer's existing trade or business of farming and/or cattle grazing. On this issue, we found that:

> Since the CRP acreage was added to his existing farmland, and since petitioner Connie Ray was already in the business of farming and ranching, this was a payment to him in connection with his ongoing trade or business. [Ray v. Commissioner, supra.[8]]

The issue in dispute in Ray was obviously different from the issue originally in dispute in this case. Given the different issues, and the factual distinctions between the two cases, we consider Ray to be of limited application here, notwithstanding respondent's concessions of the deficiencies in reliance upon that case. Furthermore, we do not consider the position originally taken by respondent here to be in conflict with the position taken by the Commissioner in Ray.

On the basis of the facts available to respondent at the relevant time,[9] we find that respondent's position had a reasonable basis in fact and law. It follows, and we hold, that

---

[8] We went on to hold that the CRP payments in question were subject to the self-employment tax. Ray v. Commissioner, T.C. Memo. 1996-436. But see Wuebker v. Commissioner, 110 T.C. ___ (1998).

[9] Petitioners' attack on the reasonableness of respondent's position is undermined by their failure to take full advantage of the opportunities to meet with IRS officials in order to discuss respondent's adjustments and present additional information in support of the disallowed deductions.

respondent's position in the administrative and litigation proceedings was substantially justified.

Because the requirements of section 7430 are conjunctive, <u>Minahan v. Commissioner</u>, 88 T.C. at 497, our holding that respondent's position was substantially justified results in the denial of petitioners' motion. Consequently, we need not address respondent's other objections.[10]

To reflect the foregoing and the Stipulation of Settled Issues filed on December 16, 1996,

<u>An appropriate order and</u>

<u>decision will be entered</u>.

---

[10] We note that petitioners have requested an award for costs incurred before the issuance of the notice of deficiency. Administrative costs are those costs incurred in connection with an administrative proceeding within the IRS. Sec. 7430(a)(1), (c)(5). Sec. 7430, for present purposes, limits recoverable administrative costs to those incurred on or after the date of the notice of the deficiency and up to the time the petition is filed. Sec. 7430(c)(2); see <u>Huffman v. Commissioner</u>, 978 F.2d 1139, 1145 (9th Cir. 1992), affg. in part, revg. in part and remanding T.C. Memo. 1991-144.

Petitioners have also requested an award for fees for their own time at an hourly rate of $45. Sec. 7430(c) operates to cover actual expenditures made with regard to representation. Consequently, pro se taxpayers are not entitled to an award for the value of their services, because no fee is paid or incurred. <u>Corrigan v. United States</u>, 27 F.3d 436 (9th Cir. 1994); <u>United States v. McPherson</u>, 840 F.2d 244 (4th Cir. 1988); <u>Frisch v. Commissioner</u>, 87 T.C. 838 (1986).