T.C. Memo. 2010-17

UNITED STATES TAX COURT

MARC VIANELLO AND MICHELLE MULLARKEY VIANELLO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15967-07.          Filed February 1, 2010.

John A. Beam III and J. Matthew Sharp, for petitioners.

Dennis R. Onnen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  Respondent determined deficiencies in
petitioners' Federal income taxes of $9,013 and $157,486 and
penalties under section 6662(a) of $1,803 and $31,497 for 2002
and 2003, respectively.[1]  The issues for decision are:  (1)

_____

[1]Unless otherwise indicated, section references are to the
(continued...)

Whether Mr. Vianello (petitioner) was in the trade or business of farming; (2) Whether petitioner was in the trade or business of acquiring loans; (3) whether a debt for which a bad debt deduction was claimed in 2003 became worthless in that year; and (4) whether petitioners are liable for accuracy-related penalties under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Kansas.

<u>Notice of Deficiency and Procedural Background</u>

On May 3, 2007, respondent issued a notice of deficiency to petitioners determining deficiencies for 2002 and 2003 (years at issue) of $9,013 and $157,486, respectively.[2] Respondent also determined penalties under section 6662(a) for 2002 and 2003 of $1,803 and $31,497, respectively. The dispute arises over the disallowance of petitioners' farm losses for 2002 and 2003 of $34,741 and $134,941, respectively; business expense "loan

---

[1](...continued)
Internal Revenue Code as amended. Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

[2]Petitioners' 2002 joint Form 1040X, Amended U.S. Individual Income Tax Return, was filed on July 23, 2004. Petitioners' 2003 joint Form 1040, U.S. Individual Income Tax Return, was filed on Aug. 3, 2004.

acquisition" losses for 2002 and 2003 of $18,723 and $302,007, respectively; and a $269,622 bad debt deduction for 2003.

## Personal Background

Both Mr. and Ms. Vianello are certified public accountants (C.P.A.s). In 1997 petitioner formed Vianello & Leonard, L.L.C., (Vianello & Leonard), a two-member accounting firm that dissolved in 2007. Petitioner specializes in forensic accounting and was heavily involved in the business of forensic consulting during the years at issue, billing 911 hours in 2002 and 1,409 hours in 2003. Ms. Vianello specializes in taxation and prepared petitioners' Federal income tax returns for the years at issue. Ms. Vianello has been a CPA since 1980 and started her own practice 25 years ago.

## Conflicts With the DuPonts

As a member of Vianello & Leonard, petitioner was hired by Robert J. DuPont (Mr. DuPont) to serve as an expert witness. Mr. DuPont refused to pay the $75,000 he owed for petitioner's services, leading Vianello & Leonard to sue and obtain a judgment against him that was later transferred to petitioner. Mr. DuPont's nonpayment was the first dispute in a series of conflicts between petitioner and the DuPonts that form the factual basis for the action at hand.

Although the DuPonts ultimately satisfied the Vianello & Leonard judgment in 2001, petitioner wanted to put Mr. DuPont out

of business because he was a "crook".  To that end, in December 2000 petitioner purchased another judgment (Dean judgment) against the DuPonts from a third party and executed on it by forcing a sheriff's sale of the DuPonts' residence and land at 22457 Mahogany Lane (Mahogany Lane property).  On July 26, 2001, using the Marc Vianello Revocable Trust (trust), petitioner won the bid on the Mahogany Lane property and subsequently filed an action against the DuPonts for unlawful detainer and other relief on account of the DuPonts' frustration of petitioner's attempts to take possession of the property.

The Mahogany Lane property was subject to a deed of trust with a principal balance of $252,000 in favor of Bank of America evidenced by a promissory note (note) executed by Mr. and Mrs. DuPont.  After petitioner's winning bid on the Mahogany Lane property and subsequent receipt of the sheriff's deed, Bank of America accelerated the indebtedness, demanding payment in full. In August 2001 petitioner formed Land Purchase of Jasper County, L.L.C. (Jasper LLC), a single-member LLC funded with money derived from a mortgage secured by petitioner's residence and cash.  On February 20, 2002, petitioner used Jasper LLC to acquire the accelerated promissory note from Bank of America for the unpaid principal balance of the note plus accrued interest totaling $268,468.  Petitioner believed that without a separate entity to hold the collateral, State law would cause the legal

title in the mortgage to merge into the equitable title he held through the sheriff's deed, essentially relieving Mr. DuPont of liability under the promissory note.

Intent on collecting from the DuPonts' other assets, Jasper LLC made a demand for payment and brought a collection action against the DuPonts for breach of the note shortly after acquiring it on February 20, 2002. Despite the loss of the Mahogany Lane property the DuPonts continued to own 10 guest homes for the mentally impaired and were also receiving payments from a second deed of trust on a commercial building they had sold.

On March 21, 2002, shortly after Jasper LLC purchased the note from Bank of America, the Duponts formed a section 501(c)(3) corporation, Joplin River of Life Ministries, Inc. (JROL). Sometime thereafter, the DuPonts transferred five of the guest homes to JROL and leased to JROL the remaining five guest homes for $12,000 per month.[3] During this time the DuPonts also received an early discounted lump-sum payoff of a second deed of trust from the buyer of the commercial building.

On November 24, 2003, a final judgment was entered in favor of Jasper LLC against the DuPonts, requiring them to pay $369,793, including attorney's fees of $28,531 and expenses.

---

[3]Mr. DuPont was one of the two incorporators, and the DuPonts were two of the initial six directors.

However, petitioners believed that the DuPonts' transfer of the guest homes to JROL and the lump-sum payoff of the commercial building loan they had negotiated, in combination with Mr. DuPont's imprisonment for Medicare fraud with a projected release date of September 28, 2004, reduced the value of the DuPonts' remaining collectible assets. Thus, petitioners claimed a bad debt deduction for 2003 of $269,622 shortly after receiving the favorable judgment.

Farming Activities

The Mahogany Lane property consisted of 100 acres of higher ground, containing pastures, woodlands, and the DuPonts' residence; and 100 river-bottom acres planted in soybeans by Charles Honey (Mr. Honey) pursuant to an oral agreement with Mr. DuPont. Under the agreement Mr. Honey was to deduct the cost of chemicals and fertilizer from the total sale proceeds of the soybeans and pay Mr. DuPont one-third of the net proceeds of the sale.

During the years at issue petitioner resided 150 miles from the property and had never met Mr. Honey in person. On July 26, 2001, petitioner contacted Mr. Honey by phone, and they orally agreed to continue the same arrangement with respect to a soybean crop in 2002 under the same terms that Mr. Honey had had with Mr. DuPont. Mr. Honey paid expenses with respect to the 2001 and 2002 soybean crops on the property, including the cost of seeds,

and provided the equipment and labor with some assistance from his grandson.  Mr. Honey made all of the decisions with respect to the crop, including what crop to plant, when to plant, what equipment to use, when to spray for weeds, when to harvest, and when and where to sell the soybeans.  After harvesting the soybean crops in 2001 and 2002 Mr. Honey marked petitioner's name on the scale tickets to identify the origin of the crops, sold the crops, and paid petitioner $775 and $1,162 for 2001 and 2002, respectively.  The payments consisted of one-third of the net proceeds after deducting the cost of chemicals to kill weeds and grass.

Petitioner's farm-related activities for 2002 consisted of having Mr. Haskell, his tenant who rented the pastureland and barn, mow the nearby pastures and tend the fences.  Petitioner also consulted with soil and horticultural experts, who advised him to change from soybeans to Bermuda grass on the river-bottom acres.  Unbeknownst to petitioner, while harvesting the October 2002 soybean crop Mr. Honey had planted wheat on the property under the assumption that the oral agreement he had with petitioner carried over into 2003.  A dispute arose between Mr. Honey and petitioner with respect to whether Mr. Honey had authority to plant the wheat, which led to a January 2003 letter from petitioner demanding Mr. Honey stay off the property.  Petitioner subsequently chained the gate to the property and

filed a suit against Mr. Honey that was pending at the time of trial of the instant case. The wheat crop was never harvested.

In January 2003, after learning of the wheat Mr. Honey planted in October 2002, petitioner entered into a contract with Joe McCoy (Mr. McCoy) to plant Bermuda grass on the river-bottom property in 2003, but the planting did not occur. In April 2003 petitioner also contacted Dennis Elbrader (Mr. Elbrader) about planting Bermuda grass on the river-bottom property in 2003. Mr. Elbrader determined that because of the property's wet condition, the weeds, and the weather, it was unlikely that he could plant Bermuda grass in 2003. Petitioner did not tend to Mr. Honey's wheat crops, plant any crops on the Mahogany Lane property in 2003, or report any income on Schedule F, Profit or Loss From Farming, for the year. Petitioner eventually had the wheat plowed under in the spring of 2004, shortly before the first planting of Bermuda grass in June 2004.

Petitioner purchased two tractors in 2002 and another tractor and hay equipment on December 19, 2003. Petitioner also purchased an additional 50 acres from a neighbor for Bermuda grass cultivation in December 2003.

Loan Acquisition and Collection Activities

In December 2003, after receiving the $369,793 judgment on the note acquired from Bank of America, Jasper LLC and petitioner began negotiations with the DuPonts. In a letter dated December

19, 2003, petitioner's attorney contacted the attorney for the DuPonts to determine their interest in setting up a payment schedule.  In similar correspondence on January 5, 2004, petitioner's attorney confirmed petitioner's interest in collecting via payments and requested a payment schedule.  The DuPonts' attorney responded on January 14, 2004, stating that Mr. DuPont suffered some heart trouble in January 2004.  No more than 2 weeks of recovery were anticipated.  In the light of the circumstances, petitioner's attorney advised him that further collection efforts would be futile.

Nevertheless, during 2004 petitioner and Jasper LLC began efforts to collect on the judgment against the DuPonts.  Jasper LLC issued three garnishment summonses to reach amounts owed by JROL, the lessee of five of the guest homes, to the DuPonts.  The summonses resulted in payments of $868 to Jasper LLC.  At the time of the garnishments, petitioner did not know that the DuPonts had retained ownership of any guest homes.  In August 2004 Jasper LLC's garnishment summons upon U.S. Bank resulted in a payment of $66.

The DuPonts owned a personal residence purchased after losing the Mahogany Lane property.  On July 28, 2004, petitioner authorized his attorney to initiate a levy on the personal residence of the DuPonts despite the existence of a first mortgage, a tax lien, and a restitution lien of $120,100 in favor

of the Federal Government arising out of Mr. DuPont's conviction for Medicare fraud.[4]  On September 27, 2004, the DuPonts filed a chapter 11 bankruptcy petition 1 day before the scheduled sheriff's sale of their residence.  Jasper LLC filed a motion for relief from the automatic stay or, in the alternative, adequate protection on January 7, 2005.  The Bankruptcy Court granted petitioner's motion on January 26, 2005, and the DuPonts subsequently filed a motion to dismiss their bankruptcy case on February 1, 2005, that was granted on February 25, 2005.

During the DuPonts' bankruptcy proceeding, petitioners learned that the DuPonts were still the owners of five of the guest homes operated by JROL and that JROL had failed to report lease payments owed to the DuPonts in the earlier garnishment actions.  Once JROL's intentional misrepresentation came to light, Missouri State law permitted Jasper LLC to obtain a judgment against JROL on March 11, 2005, for the amounts JROL paid to the DuPonts; i.e., $108,000, plus attorney's fees of $7,467.

On April 4, 2005, petitioner's attorney sent a letter to Mr. DuPont with an attached agreement to pay judgment and suspend collection and release of garnishment (agreement).  The agreement covered both the final judgment obtained by Jasper LLC against

[4]These liens also covered the five guest homes the DuPonts retained.

the DuPonts on November 24, 2003, on the promissory note acquired from Bank of America, and the judgment obtained by Jasper LLC against JROL in March 2005. The parties entered into the agreement, and the DuPonts made all scheduled payments in 2005 totaling $81,392 (i.e., $44,928 of attorney's fees accrued after December 31, 2003, and $36,464 of interest accrued on the judgment), which petitioners reported in Schedule C, Profit or Loss From Business, of their 2005 Form 1040. The DuPonts made payments for the first 11 months of 2006 totaling $44,568 (composed entirely of interest on the outstanding judgments), as reflected in Schedule C of petitioners' 2006 Form 1040. Jasper LLC recovered $126,894 on the final judgment it obtained against the DuPonts, consisting of $934 received from garnishments in 2004, $81,392 in payments received in 2005 representing attorney's fees and interest, and $44,568 in interest received in 2006. The payments made in 2004, 2005, and 2006 did not represent recovery of the $369,793 principal amount but simply attorney's fees incurred by Jasper LLC and interest on the 2003 judgment. These payments continued until November 28, 2006, when a fire at JROL caused the death of 10 people. Mr. DuPont was again indicted for fraud, and the payments to petitioners ceased.

Accuracy-Related Penalties

Ms. Vianello prepared petitioners' 2002 and 2003 income tax returns. Before claiming the farm losses reported on Schedule F,

Ms. Vianello used Internal Revenue Service (IRS) Publication 225, Farmer's Tax Guide, as the basis for conducting an interview with petitioner to conclude that he materially participated in the farm trade or business. In preparing Schedule C, Ms. Vianello interviewed petitioner and determined that Jasper LLC was engaged in the trade or business of acquiring and collecting the DuPonts' debts.

OPINION

I.  Trade or Business of Farming

Respondent determined that petitioner was not in the trade or business of farming in 2002 and 2003 and thus could not claim his depreciation and expenses as Schedule F deductions. Petitioner argues he was in the trade or business of farming since he purchased a farm and shared in its production with Mr. Honey. Petitioner further cites his involvement in major management decisions and his risk of loss in the activity as factors indicative of a trade or business.

Deductions are strictly a matter of legislative grace, and taxpayers must satisfy the specific requirements for any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers bear the burden of substantiating the amount and purpose of any claimed deduction. See Hradesky v.

Commissioner, 65 T.C. 87 (1975), affd. 540 F.2d 821 (5th Cir. 1976).

Under section 162(a) a taxpayer may deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Although the term "trade or business" is not precisely defined in section 162 or the regulations promulgated thereunder, it is well established that in order for an activity to be considered a taxpayer's trade or business for purposes relevant here, the activity must be conducted "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Wittstruck v. Commissioner, 645 F.2d 618, 619 (8th Cir. 1981), affg. T.C. Memo. 1980-62. In addition, the taxpayer's business operations must have actually commenced. Goodwin v. Commissioner, 75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982).

A.    Trade or Business of Farming in 2002

Petitioner argues that he was in the trade or business of farming because he claims he was involved in major farm management decisions; provided and maintained fences, road access, and security; and discussed row crop alternatives, cockleburs, and Bermuda grass planting with Mr. Honey. In further support of his involvement in 2002, petitioner argues

that he purchased a farm and continued the agreement with Mr. Honey, whereby each shared in the farm's proceeds, with petitioner treating it as income from the production of crops. As proof of the arrangement petitioner cites Smith v. McNew, 381 S.W.2d 369 (Mo. Ct. App. 1964), which distinguishes a tenant's interest from that of a cropper, and offers a letter from the U.S. Department of Agriculture (USDA) that states Mr. Honey and petitioner's revocable trust were producers and were actively engaged in farming.

Despite petitioner's claimed involvement, Mr. Honey paid all expenses with respect to the 2002 soybean crop, including the costs of seeds and pesticides, and provided the equipment and labor. Mr. Honey also made all decisions with respect to the crop, including what crop to plant, when to plant it, what equipment to use, when to spray for weeds, when to harvest, and when and where to sell the soybeans. Moreover, the USDA determination that Mr. Honey and petitioner's revocable trust were actively engaged in farming and were coproducers for USDA purposes has no bearing on whether petitioner was engaged in such a trade or business for purposes of section 162(a), nor does it permit petitioner to impute Mr. Honey's farming activities to himself for such purposes. It is clear to us that different criteria are taken into account by the USDA in making such determinations. See A.B.C.D. Lands, Inc. v. Commissioner, 41

T.C. 840, 849 (1964); <u>Hasbrouck v. Commissioner</u>, T.C. Memo. 1998-249, affd. without published opinion 189 F.3d 473 (9th Cir. 1999).[5]

As further evidence of the existence of a trade or business, petitioners claim they had a risk of loss with regard to the crops since an unsuccessful harvest would decrease the income from the property and leave petitioners responsible for reimbursing Mr. Honey for his one-third share of the cost of the chemicals. However, it does not seem clear from the facts that petitioners were responsible for any costs of chemicals and fertilizer in the event of an unprofitable harvest as opposed to Mr. Honey's bearing the risk of his decisions' failing to produce a crop. Petitioner did not provide equipment or labor and was not involved in the planting, spraying, harvesting, or selling of

---

[5]Petitioner cites <u>Mizell v. Commissioner</u>, T.C. Memo. 1995-571, and <u>Estate of Sherrod v. Commissioner</u>, 82 T.C. 523 (1984), revd. on another issue 774 F.2d 1057 (11th Cir. 1985), inviting us to look beyond the agreement between petitioner and Mr. Honey to find that petitioner materially participated and was engaged in the trade or business of farming. We decline petitioner's invitation and note that the issue of material participation, as it arose in those cases, is a factor that we consider in the context of net earnings from self-employment under sec. 1402(a) and/or special use valuation under sec. 2032A. Sec. 1402(a) requires a lessor or owner to include rental income in net earnings from self-employment if it is received from a farm in which he materially participates. Furthermore, the regulations under sec. 1402(a) make it clear that petitioner's efforts do not constitute production or the management of the production as required to meet the material participation standard. See sec. 1.1402(a)-4(b), Income Tax Regs.

the crop. Petitioner's services in connection with production of the crop in 2002 seemingly consisted of asking Mr. Haskell to mow the grassy areas of petitioner's adjacent pastures and tend the fences. Such services are not integrally related to the income-producing activity of growing soybeans during the years at issue inasmuch as Mr. Honey testified that he has never met Mr. Haskell or petitioner. Furthermore, petitioner resided 150 miles from the property and was primarily engaged in the business of forensic consulting, billing substantial hours during the years at issue. Thus, we hold that petitioners were not engaged in the trade or business of farming in 2002.

   B.   Trade or Business of Farming in 2003

During the 2002 harvest Mr. Honey planted wheat and was informed in January 2003 that he was not permitted to enter the property. During 2003 petitioner did not tend to Mr. Honey's wheat crop or plant any crops of his own. Nor did he report any income on Schedule F for the year. Mr. Elbrader testified that petitioners intended but were unable to plant in 2003 because the property was covered by unharvested wheat and was also too wet and muddy. In December 2003 petitioner purchased 50 additional acres from a neighbor. On December 19, 2003, petitioner purchased a tractor, a loader, a mower, and a baler for use with Bermuda grass, despite the fact that it would not have been possible to plant Bermuda grass on the property until spring 2004

at the earliest.  On the basis of the absence of farm-related
activities during 2003, we find that petitioner's purchases of
the tractor and attachments were not ordinary and necessary
expenses incurred in connection with the trade or business of
farming in 2003.[6]

Petitioner's farm-related activities in 2002 and 2003 were
not sufficient to constitute a trade or business.  During 2003
petitioner did not plant, cultivate, or tend a crop of any kind,
and his farm-related activities were not continuous or regular.
Moreover, petitioner has not established that a trade or business
with respect to soybeans, Bermuda grass, or any other crop
commenced during the years at issue.  Finally, petitioner has
failed to show how the claimed Schedule C expenses would
constitute ordinary and necessary expenses of a farm trade or
business or that such expenses were not preproduction expenses
incurred in anticipation of a trade or business in farming.
Section 195, in effect for the years at issue, provides that no
deduction shall be allowed for startup expenditures, except that
a taxpayer may elect to treat such expenditures as deferred
expenses deductible over a period of not less than 60 months,
beginning with the month in which the active trade or business

---

[6]Petitioner argues that 1 year of no sales of crops such as
occurred in 2003 should not remove him from the trade or business
of farming.  However, petitioner was not regularly and actively
involved in farming activity until at least 2004.

begins.  Petitioners failed to make such an election for the years at issue but later filed a "Protective Election to Amortize Start-Up Expenses", citing section 195(b), with their 2004 Federal income tax return.  For the above reasons, the Schedule F depreciation and expenses petitioners claimed in 2002 and 2003 may not be deducted and must be capitalized.

II.  <u>The Trade or Business of Loan Acquisition in 2002 and 2003</u>

Respondent determined that neither petitioner nor the solely owned Jasper LLC was in the trade or business of loan acquisition and thus could not claim Schedule C loss deductions for the years 2002 and 2003 of $18,723 and $302,007, respectively.[7]  Petitioners assert that the Vianello & Leonard suit for nonpayment and the subsequent judgment, the purchase of the Dean judgment, the suit against the DuPonts for unlawful detainer, and the purchase of the note from Bank of America constitute a trade or business of engaging in profitable litigation against the DuPonts.

These four actions do not constitute the type of activity that rises to the level of a trade or business.  In <u>Green v. Commissioner</u>, T.C. Memo. 2005-250, affd. 507 F.3d 857 (5th Cir. 2007), cited by petitioners, we rejected the taxpayer's argument that his repeated attempts to collect a judgment against the State of Texas constituted a trade or business, stating:

---

[7]Jasper LLC was a disregarded entity and did not make an election to be treated as a corporation under the regulations.

> Though petitioner continuously and regularly engaged in the activity of attempting to recover his judgment between 1991 and 1995, we cannot conclude that petitioner was in a trade or business in the customary use of those terms.  Petitioner did not perform services for others, he had no customers, and he was not in the business of trading securities or gambling on a regular and continuous basis.  See id. [Commissioner v. Groetzinger] at 33-34.  Petitioner's asserted purpose was to secure the compensation to which he was entitled.  Although a trade or business requires continuous and regular activity, continuity and regularity, do not, standing alone, constitute a trade or business. * * *

Despite their claim, neither petitioners nor the LLC performed services for others, had customers, or were in the business of trading notes or loans.  Furthermore, there is no evidence that petitioners ever considered the Vianello & Leonard judgment or the suit for unlawful detainer to be part of a trade or business.  Of the remaining actions, petitioners used Jasper LLC to purchase the note from Bank of America to prevent merger of title instead of purchasing the note themselves.  That action establishes petitioners' interest, not in establishing a trade or business of acquiring loans, but in preserving the opportunity to collect against other property owned by the DuPonts.  Thus, petitioner's four actions against the DuPonts do not establish the continuous and regular activity needed to prove the existence of a trade or business but highlight his attempts to "secure the compensation to which he was entitled." See id.

Under such circumstances we find that petitioners have failed to prove petitioner's or Jasper LLC's involvement in the

trade or business of acquiring loans, the ongoing business of collecting debts, or of farming during the years at issue. Therefore, we disallow the disputed Schedule C deductions for the years at issue.

III. <u>Treatment of the Bad Debt Deduction</u>

Most of the $302,007 Schedule C loss petitioners claimed in 2003 consists of a claimed bad debt of $269,622 arising from the worthlessness of the promissory note against the DuPonts Jasper LLC acquired on February 20, 2002. The issue we must address is whether that debt became worthless in 2003.

An individual taxpayer may deduct as a short-term capital loss a nonbusiness debt that becomes wholly worthless during the taxable year. Sec. 166(d). However, the taxpayer has the burden of proving that he or she is entitled to any claimed deductions. <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. at 84. Thus, petitioners have the burden of proving that the $269,622 note became wholly

worthless in 2003.[8]  See Rule 142(a); <u>Crown v. Commissioner</u>, 77 T.C. 582, 598 (1981).

There is no standard test or formula for determining worthlessness, and the determination depends upon the particular facts and circumstances of the case.  <u>Lucas v. Am. Code Co.</u>, 280 U.S. 445, 449 (1930); <u>Crown v. Commissioner</u>, <u>supra</u> at 598.  A taxpayer usually must show identifiable events to prove worthlessness in the year claimed.  <u>Crown v. Commissioner</u>, <u>supra</u>; <u>Dallmeyer v. Commissioner</u>, 14 T.C. 1282, 1291-1292 (1950).  The taxpayer must demonstrate that the debt had value at the beginning of the year in which the taxpayer claimed worthlessness and that the debt became worthless in that year.  <u>Am. Offshore, Inc. v. Commissioner</u>, 97 T.C. 579, 593 (1991); <u>Dustin v. Commissioner</u>, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972).

---

[8]Petitioners argue that the burden of proof with respect to the issue of worthlessness of the note should shift to respondent pursuant to Rule 142(a)(1) on the grounds that it constitutes a new matter.  We disagree. In <u>SDI Netherlands B.V. v. Commissioner</u>, 107 T.C. 161, 168 (1996) (quoting <u>Zarin v. Commissioner</u>, 92 T.C. 1084 (1989), revd. on other grounds 916 F.2d 110 (3d Cir. 1990)), we stated that: "'A new position taken by respondent is not necessarily a "new matter" if it merely clarifies or develops respondent's original determination without requiring the presentation of different evidence, being inconsistent with respondent's original determination, or increasing the amount of the deficiency.'"  Here, respondent has not increased the deficiency, the issue of worthlessness is not inconsistent with respondent's original determination, the issue does not require new evidence, and it develops respondent's original determination.

Debts become wholly worthless when the taxpayer has no reasonable expectation of repayment. Crown v. Commissioner, supra. The worthlessness of the debt must be determined as of the time the deduction is claimed. Estate of Scofield v. Commissioner, 266 F.2d 154, 163 (6th Cir. 1959), affg. in part and revg. in part 25 T.C. 774 (1956). However, subsequent events may be considered to test the soundness of the decision. Am. Offshore, Inc. v. Commissioner, supra at 597.

A.    Absence of an Identifiable Event Causing Worthlessness

Petitioners contend the judgment became worthless during 2003 and subsequent collection attempts in 2004 were made to confirm its worthlessness. In characterizing the judgment as worthless, petitioners point to the fact that the DuPonts transferred their business assets to JROL and liquidated a second mortgage on a commercial building, which were the targets of petitioners' collection action. Petitioners note that Mr. DuPont was incarcerated and, as part of his sentence, the Federal Government obtained a restitution lien and Mr. DuPont was barred from participating in any business associated with insured healthcare benefits. Petitioners further claim that Mr. DuPont suffered a severe heart attack, that the IRS filed an NFTL against the DuPonts' property, and the DuPonts' residence was subject to a first mortgage.

Despite their characterization of the facts, petitioners failed to point to an identifiable event that demonstrated the debt was worthless at the end of 2003.  Contrary to petitioners' allegations, the DuPonts did not transfer all of their business assets to JROL, and the substantial rental income the DuPonts received from the five retained guest homes could continue despite Mr. DuPont's imprisonment.  Mr. DuPont's imprisonment does not establish that the debt was worthless, and petitioners were aware of his indictment in January 2001 before they purchased the Mahogany Lane property or acquired the note against the DuPonts.  See Tower Loan of Miss., Inc. v. Commissioner, T.C. Memo. 1996-152.  Nonetheless, petitioners made numerous attempts to collect the judgment during Mr. DuPont's imprisonment. Furthermore, despite petitioner's allegation that Mr. DuPont suffered a severe heart attack, the record indicates that the heart problem did not arise until January 2004 and that no more than 2 weeks of recovery were anticipated.

B.   Attempts at Settlement

Respondent argues that the debt owed to petitioners was not worthless at the end of 2003 and cites the parties' postjudgment settlement attempts as evidence of its perceived value.  The judgment was not obtained until November 24, 2003, and in December 2003 negotiations began between Jasper LLC and the DuPonts to enter into a payment schedule to satisfy the judgment.

The negotiations were ongoing as of December 31, 2003, and continued into 2004 as evidenced by correspondence between the attorneys for petitioners and the DuPonts. We find that these ongoing negotiations detail petitioners' intention to continue collection efforts into 2004 and beyond and highlight the absence of an identifiable event showing worthlessness of the debt at the end of 2003.

C.   Payments Received on the Judgment

Petitioners received $126,894 in payments from the DuPonts on the judgment in the 3 years after 2003. Petitioners argue that the $934 collected through garnishments in 2004 was paltry and inconsequential while the $81,392 received in 2005 and the $44,568 in 2006 pursuant to the April 2005 agreement with the DuPonts were related not to the 2003 judgment but the JROL judgment from 2005. The fact that a claimed bad debt is paid in a subsequent year does not necessarily bar a deduction in a prior year. However, the fact that substantial payments were made in 2004 through 2006 further suggests that the debt held by Jasper LLC against the DuPonts had value as of the end of 2003. See Buchanan v. United States, 87 F.3d 197 (7th Cir. 1996). Moreover, the 2005 agreement between petitioners and the DuPonts to pay the judgment and suspend collection clearly indicates that the 2005 and 2006 payments were made in satisfaction of the

judgment against the DuPonts entered on November 23, 2004, and the one against JROL entered on March 11, 2005.

### D.   Petitioners' Subsequent Collection Efforts

Respondent further emphasizes petitioners' substantial collection efforts in 2004 through 2006 to demonstrate the value of the judgments to petitioners and Jasper LLC.  Beginning in 2002 Jasper LLC pursued the suit against the DuPonts on the note for more than a year, incurring $28,531 in attorney's fees and expenses before being awarded a judgment on November 24, 2003. Jasper LLC subsequently incurred legal fees and expenses of $44,928 over the next few years, primarily in connection with the attempted collection of the judgment.  On July 28, 2004, petitioner authorized his attorney to initiate the costly process of levying on the personal residence of the DuPonts to collect on the judgment.  We are not persuaded that petitioners, through Jasper LLC, incurred such substantial attorney's fees and expenses to obtain and collect on the judgment against the DuPonts without any reasonable expectation of repayment.

After carefully considering all the facts and circumstances, we find that petitioners have failed to prove that the $269,622 nonbusiness debt became wholly worthless in 2003.  See sec. 166(d).  Petitioners failed to demonstrate an identifiable event causing the debt to become worthless in 2003, their settlement negotiations carried over beyond 2003, they ultimately recovered

a significant amount on the judgment in the subsequent 3 years, and they incurred extensive costs in attempting to collect. Thus, we sustain respondent's determination on this issue.[9]

IV.  Section 6662(a) Penalty

Section 6662(a) and (b)(2) imposes a 20-percent accuracy-related penalty on the portion of any underpayment that is attributable to a substantial understatement of income tax.  An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).  The Commissioner bears the burden of production with respect to penalties.  Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Once the burden of production is met, the taxpayer must come forward with evidence sufficient to show that the penalty does not apply.  Higbee v. Commissioner, supra at 447.

According to our determinations above, the tax required to be shown on petitioners' return was $18,391 and $226,357 for 2002 and 2003, respectively.  Ten percent of the amount of tax required to be shown in 2002 and 2003 is $1,839 and $22,635, respectively.  Consequently, petitioners' understatements are substantial only if they exceeded $5,000 for 2002 and $22,635 for 2003.  Petitioners' understatements for 2002 and 2003 were $9,013

_____

[9]Because of our holding herein, we do not address the question of whether the debt involved was a business or nonbusiness bad debt.

and $157,486, respectively.  Thus, respondent has satisfied his burden of production by showing that petitioners' understatements of tax were substantial in both of the years at issue.

Respondent determined petitioners are liable for accuracy-related penalties under section 6662(a) of $1,803 and $31,497 for 2002 and 2003, respectively.  For purposes of determining the accuracy-related penalty, the amount of the understatement is reduced by the portion of the understatement that was attributable to the tax treatment of an item where:  (1) The taxpayer had substantial authority for his position; or (2) the taxpayer adequately disclosed his or her position and has a reasonable basis for such position.  Sec. 6662(d)(2)(B).  Petitioners argue that they had substantial authority for claiming the deductions and that they made adequate disclosures and had a reasonable basis for their position.  Respondent disagrees.

A.   Substantial Authority and Adequate Disclosure

There is substantial authority for a specific tax treatment only if the weight of the authorities supporting the treatment is substantial in relation to the weight of those supporting contrary treatment.  See sec. 1.6662-4(d)(3)(i), Income Tax Regs.  Moreover, the substantial authority standard is an objective one, and the taxpayer's belief that there is substantial authority for the tax treatment of an item is not relevant.  Id.  Petitioners

have not met this objective standard. As we found above, the cases petitioners cited are distinguishable and do not stand for the proposition that the expenses petitioners incurred before engaging in the trade or business of farming are deductible or that Jasper LLC's purchase of a single loan qualifies as a trade or business for tax purposes.

Petitioners argue that they adequately disclosed the relevant information in a footnote to Schedule C and had a reasonable basis for their position. Adequate disclosure generally requires the inclusion of Form 8275, Disclosure Statement, with the return. See sec. 1.6662-4(f), Income Tax Regs. Petitioners did not include that form. Moreover, reasonable basis "is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim". Sec. 1.6662-3(b)(3), Income Tax Regs. Thus, we find petitioners did not have a reasonable basis for their tax treatment.

B.  Reasonable Cause and Good Faith

The accuracy-related penalty is not imposed with respect to any portion of the underpayment if the taxpayer can establish he acted with reasonable cause and in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable

cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances, including the extent of the taxpayer's efforts to assess his or her proper tax liability and the taxpayer's education, knowledge, and experience. Sec. 1.6664-4(b)(1), Income Tax Regs. The extent of the taxpayer's efforts to assess the proper tax liability is generally the most important factor. Id.

Both petitioners were certified public accountants in 2002 and 2003. The returns for the years at issue were prepared by Ms. Vianello, who has been a CPA since 1980, who started her own practice 25 years ago, and who is a tax specialist. Despite this background and her admitted lack of experience in farm matters, there is no evidence that she did any research with respect to the deductibility of the claimed Schedule F losses other than consulting an IRS publication and related forms. There is no evidence that she did any research with respect to the claimed Schedule C losses. Rather, she merely interviewed petitioner to assess the proper tax liability. Petitioners have extensive knowledge and experience in tax law but did not make a significant effort to determine their eligibility for the claimed losses under Schedule C or F or properly evaluate the facts regarding the worthlessness of the DuPonts' debt in 2003. Under the circumstances, petitioners have not shown they acted with reasonable cause and good faith.

For the above reasons, we find petitioners are liable for accuracy-related penalties under section 6662(a) of $1,803 and $31,497 for 2002 and 2003, respectively.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.